STALL & McDERMOTT v. THE SOUTHERN CROSS et al.

No. 13655.

United States Court of Appeals
Fifth Circuit.

May 8, 1952.

Brunswick G. Deutsch, New Orleans, La., for appellant.

Edwin H. Grace, New Orleans, La., for appellees.

Before HOLMES, BORAH, and STRUM, Circuit Judges.

BORAH, Circuit Judge.

The libel in this case was filed by Stall & McDermott against the tug Southern Cross and her owner, Grizzafi Towing Company, to recover for the loss of the quarterboat Lorraine while in tow of the Southern Cross.

The libel alleged that the sinking was caused by the negligence of the tug Southern Cross in towing the quarterboat Lorraine at an excessive rate of speed and because those in charge of the navigation of the tug neglected and refused to heed the signals of the Lorraine's attendant when the tow was in distress. The answer denied the negligence charged and affirmatively set up that the Lorraine sank because of its unseaworthy condition. The District Court found in favor of appellees and dismissed the libel, Stall & McDermott v. The Southern Cross, D.C., 95 F.Supp. 612, and to reverse that judgment this appeal is prosecuted. The facts briefly stated are these:

On January 8, 1945, Drinkwater, representing appellant, and Grizzafi, representing appellee, entered into a verbal contract for the towage of the Lorraine from Morgan City, Louisiana, to a job site near Pecan Island in White Lake, Louisiana.

The quarterboat Lorraine was a flat-bottomed, wooden barge; she had a length of 36', beam of 16' and depth of 3'. Her hull and side planking were 2" x 12" timbers and her inside seams were stripped with 1" x 3" battens. The Lorraine's superstructure consisted of upper and lower deckhouses. On the upper deckhouse there were installed two fresh water tanks of about 900 gallons each. One tank was forward and slightly to starboard of the center line, the other was aft and slightly to port of the center line. The age of the quarterboat was unknown and except for painting she had undergone no maintenance or repair work of any kind for a period of two years.

On January 9, 1945, Gibbs was sent to Morgan City by appellant's superintendent, Drinkwater, to take charge of the loading of the Lorraine. Gibbs was specifically directed to fill her upper water tanks, to see that her hull was pumped free of water, and generally to watch over her while she was being towed to destination. When Gibbs arrived at Morgan City the Lorraine was across the Atchafalaya River at Berwick, where she had been tied up for an indefinite period of time. Gibbs requested of Grizzafi that the Lorraine be brought over to the Morgan City dock and this was done after Gibbs had inspected her hull and pumped out the water which he found in the hold. While alongside the dock Coleman, the master of the Southern Cross, noticed that Gibbs was filling the upper tanks with water and, being fearful that this might make the quarterboat top heavy, he asked Gibbs not to do it and told him that if it was necessary to fill these tanks he was not going to take the quarterboat in tow. Whereupon Gibbs advised Coleman that he had full charge of the quarterboat and that was his responsibility, not the master's. Gibbs told Coleman to take charge of the tug and he would take care of the quarterboat and when he finished loading the tanks they would take off. The conversation there ended.

The tug and tow got under way at 1:00 P.M. and proceeded westward in the Intercoastal Canal at a slow and safe speed of approximately 2½ miles per hour. At 12:30 A.M., after having proceeded without incident or difficulty a distance of approximately thirty miles, they laid up for the night. Before again getting under way Gibbs requested and was supplied with a smaller pump from the tug. The large pump, because of its greater capacity, required constant attention for when it pumped down to three and one half or four inches, which was below the level of the strainer or foot valve on the suction line, the pump would begin sucking in air and lose its prime. In consequence the gasoline pump motor had to be stopped, the pump reprimed, and the motor again restarted. Gibbs was constantly stopping and restarting the pump's motor and his purpose in requesting the use of the smaller pump was because he believed it would operate continuously and keep the water down.

At daybreak, and under favorable conditions of wind and weather, the voyage was

resumed. The tug continued towing the quarterboat at the same slow speed and after about five hours of towing the quarterboat suddenly capsized. The tug captain saw the quarterboat going over, unleashed the tow and went alongside and assisted Gibbs in getting out through the port window in the upper deckhouse.

There was creditable expert opinion evidence to show that the quarterboat with the weight of the water loaded in her two tanks was seaworthy and would remain stable provided the water in the hull was kept under six inches. That when the water got above the six inch floor or buck frames running fore and aft it became free water, which would surge fore and aft and destroy the stability of the vessel, and she would turn over even if moored to a dock. Further that the speed at which the vessel was towed had nothing to do with her capsizing.

The testimony of Gibbs, who alone supports the allegations of the libel, gives a different account but his inconsistent and improbable story did not impress the District Judge, it is unsatisfactory to us.

The judge of the District Court, who saw and heard [1] the witnesses testify, held that there was no negligence or lack of reasonable skill and care on the part of the tug and that the quarterboat capsized when she became unseaworthy through an excess of water in her hull which entered through her seams.

The assignments of error all relate to the same thing; that is, upon whom the liability, under the circumstances of this case, should fall. The question turns almost entirely upon the facts, as there is but little dispute about the law.

The law regarding towage is well settled. The mere fact that a tow receives injury does not render the tug liable. Negligence must be affirmatively shown and the burden of proving negligence rests upon those seeking to establish liability therefor. The tug is not liable as an insurer or as a common carrier, but owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The "Margaret," 94 U.S. 494, 24 L.Ed. 146; The Lapwing, 5 Cir., 150 F.2d 214; The Clarence L. Blakeslee, 2 Cir., 243 F. 365; The Atlantic City, 4 Cir., 241 F. 62.

We think it clear that the facts in this case sustain the holding of the District Court in the respects indicated. On the record before us we are satisfied that the appellant has not borne the burden of proof resting upon it to establish that the sinking of the Lorraine was due to the fault of the tug while in tow. Nor has the appellant shown bad seamanship on the part of the tug for having taken the Lorraine in tow. The expert testimony in this case is all one way and to the effect that with her upper tanks filled with water to the extent they were filled, the Lorraine was seaworthy and would remain seaworthy provided the water in the hull was kept below six inches or, according to libellant's expert, nine inches. Under these circumstances the tug's master was called upon to exercise special care in the light of the knowledge that the tanks were filled and the preponderance of the testimony is that he was not wanting in this regard.

From our view of the case, the District Court was clearly right in its conclusions and its decree should be affirmed, with costs.

Affirmed.

1. Two of libellant's witnesses testified in the form of depositions. Their testimony was not contrary to the court's findings.