**RIVER TERMINALS CORPORATION,**
Appellant,

v.

**SOUTHWESTERN SUGAR AND MO-
LASSES COMPANY, Inc.,**
Appellee.

No. 16699.

United States Court of Appeals
Fifth Circuit.
Jan. 19, 1960.

Selim B. Lemle, New Orleans, La.,
Carl G. Stearns, Fulbright, Crooker,
Freeman, Bates & Jaworski, Houston,
Tex., Lemle & Kelleher, New Orleans,
La., for River Terminals Corp., appellant.

Amos L. Ponder, Jr., P. M. Flanagan,
New Orleans, La., George L. Varian,
New York City, for appellee.

Before HUTCHESON, TUTTLE and
BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a decree hold-
ing appellant, River Terminals Corpora-
tion (hereafter, sometimes, for conven-
ience, R.T.C.), liable to appellee, South-
western Sugar and Molasses Company,
Inc. (hereafter Southwestern) for dam-
ages to the barge Peter B and a cargo
of molasses. This is the second appear-
ance of the case here. Formerly we held,
5 Cir., 253 F.2d 922, that if there was
fault on the part of R.T.C., such fault
was excused under the terms of the tariff
on file with the Interstate Commerce
Commission; that such exculpatory
clause of the tariff was valid unless ef-
fectively set aside by appropriate pro-
ceedings before the I.C.C.; that, there-
fore, the case should be remanded to the

district court to permit an attack to be made on the tariff by Southwestern, in default of which the decree should be set aside. The Supreme Court granted certiorari, 358 U.S. 811, 79 S.Ct. 38, 3 L.Ed.2d 55. It affirmed the view of this court that liability could not be decreed against R.T.C. in the teeth of the exculpatory clause in the tariff, without first submitting the matter to the Interstate Commerce Commission but remanded the case to this Court to pass on the other grounds of appeal since a resolution of any one of them adverse to Southwestern would obviate the necessity for testing out the validity of the tariff provisions, 360 U.S. 411, 79 S.Ct. 1210, 3 L. Ed.2d 1334.

We, therefore, turn our attention to the basic question: Was the River Terminals Corporation guilty of negligent towage in the movement of the Barge Peter B with its cargo of molasses or in the disposition of the barge and cargo at its destination?

Appellee contends that R.T.C. accepted the barge after receiving notice that there were leaks in the No. 2 hold; that it towed it to its destination, and delivered it substantially in a sinking condition and left it without proper safeguards, and that when it sank some 24 to 30 hours later this casualty resulted from the negligent conduct of the towers.

Appellant contends that it received the barge in damaged condition; that the damage of which it was put on notice did not contribute to the sinking of the barge; that in any event it delivered the barge to the designated slip of Southwestern; that it was then afloat and was seen by two employees of Southwestern afloat, but in a dangerously low condition at a time when an election to pump the cargo would admittedly have saved both barge and cargo; that therefore the damage and loss must be attributed to the acts of the shipper and were not the result of any negligent act of the carrier.

■ We approach the fact questions relating to liability reluctantly. Not only does McAllister v. United States,

348 U.S. 19, 75 S.Ct. 6, 8, 99 L.Ed. 20, expressly hold that "in reviewing a judgment of a trial court sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous" but this Court had before the McAllister case recognized that the standard of review in such a case is the same as for review of a law case under Rule 52(a), F.R.Civ. P. 28 U.S.C.A. See C. J. Dick Towing Co. v. The Leo, 5 Cir., 202 F.2d 850; Colvin v. Kokusai Kisen Kabushiki Kaisha, 5 Cir., 72 F.2d 44, 46. Nevertheless, when, as is here the case, the party held at fault vigorously challenges the finding of liability we must accept our "eventual responsibility for the facts as well as for the law." Deep Sea Tankers v. The Long Branch (Rincon Hills) 2 Cir., 258 F.2d 757, 759, Thorne, Neale & Co. v. Reading Co., 2 Cir., 87 F.2d 694, 696. We have, therefore, carefully reviewed the record, and conclude that the trial court's finding that the sinking of the barge resulted from R.T.C.'s negligent towage was clearly erroneous.

Taking the evidence adduced most strongly against the carrier, we find that the libellant proved that while its old barge was being filled at Reserve, Louisiana, for carriage of some 155,000 gallons of molasses in its eleven tanks, Frieler, agent for libellant, discovered that there was a leak in the No. 2 tank; No. 1 tank was opposite No. 2 tank and in order to keep the barge in trim no additional molasses was pumped into No. 1 tank; these were bow tanks, and a small amount of molasses already pumped into No. 1 and No. 2 tanks was left there; forward of these two tanks was the bow rake, designed to give forward buoyancy; a similar rake was at the stern, which also had the buoyancy of a large pump room; Frieler notified R.T. C.'s Houston office of this leak after the barge had been moved from the dock; during the several days during which R.T.C. moved the Peter B downriver and west through the intercoastal canal, the Peter B lost some freeboard forward; at the time she was taken in tow by

R.T.C.'s tug Dottie D to proceed across open water to Texas City, Texas, the only evidence in the record is that she had freeboard of from nine inches to a foot at the bow; the Peter B was pushed stern first to Texas City after the Dottie D's captain and mate both sounded the forward and aft rakes and found them dry.[1] The Dottie D tied up the Peter B at the slip of Southwestern where designated by the watchman on duty at 12:01 A.M. Saturday. At that time the freeboard forward was the same as when the Dottie D took the barge in tow; at about 8:00 A.M. Saturday morning, one Garcia, an employee of Southwestern whose duties had included the pumping of the cargo from this barge on prior occasions, saw the barge and noticed that it was low in the water at the starboard bow; that the water was going over the right hand corner of the bow and going some two or three feet on deck; Garcia notified a Mrs. White, an office employee who had been left in charge by Frieler, who had left for the week-end on other business. Both Garcia and Mrs. White testified that they could have pumped out the cargo if they had been instructed to do so; Mrs. White called the office of R.T.C. and reported the condition of the barge; and one Stovall told her the captain of the tug was then in his office and that this was the same condition the barge had been in when he took it in tow and when he had delivered it, and that there was nothing to be concerned about; Frieler had left instructions with Mrs.

White that the barge was not to be unloaded until a Captain Wynne, a surveyor for cargo, was present and he had arranged with Wynne to be present on Monday morning for this purpose; therefore, Mrs. White then (at about 9:00 or 10:00 o'clock Saturday morning) called Wynne and told him the condition of the barge and of his conversation with Stovall, and Wynne "said he wouldn't be down to see it until Monday with Mr. Frieler."[2] Mrs. White went home at noon on Saturday, at which time the barge was in the same condition as it had been at 8:00 A.M. The next she knew of it was that at about 9:00 o'clock on Sunday morning the watchman telephoned her that it was in a sinking condition, "the water was over the top clear up to the last two valves in front of the engine room"; she put in calls for Stovall and Wynne and then about 2:00 or 3:00 o'clock in the afternoon she arranged to start pumping the cargo.

■■ The standard of care owed by one in the position of the appellant (without reference to the tariff question) has been stated by us in Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309, 311;

> "The law regarding towage is well settled. The mere fact that a tow receives injury does not render the tug liable. Negligence must be affirmatively shown and the burden of proving negligence rests upon those seeking to establish liability therefor. The tug is not liable as an in-

1. The trial court's finding (made several months after the appellant had filed its appeal to this court) that no inspection had been made of the rakes is unsupportable in view of the positive affirmative testimony of Captain Allemand and the statement of Mate Theriot, the latter having been tendered in evidence by appellee.

2. This testimony as to the attitude of the person who Mrs. White understood from Frieler could give her instructions in his absence, since she had been forbidden to pump it out except in his presence was:
   "A. * * * I told him that I had been down to see it and the condition it

was and that I had called Mr. Stovall and told him the condition it was in and that—the same conversation I repeated to him that I had had with Mr. Stovall and he said that he wouldn't be down to see it until Monday with Mr. Frieler.
   "Q. Did Captain Wynne seem alarmed at the fact that water was coming over or washing over the forward right hand corner of the barge? A. No, he didn't.
   "Q. Did you tell him that was the condition was you [sic]? A. Yes, sir, I did.
   "Q. Are you positive of that? A. Yes, sir."

surer or as a common carrier, but owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; 'The Margaret', 94 U.S. 494, 24 L.Ed. 146; The Lapwing, 5 Cir., 150 F.2d 214; The Clarence L. Blakeslee, 2 Cir., 243 F. 365; The Atlantic City, 4 Cir., 241 F. 62."

■ Here, when it is undisputed that the tower delivered the barge at a time and under circumstances that allowed ample opportunity to the shipper fully to have protected the barge and cargo,[3] there is absolutely no showing of a failure in the performance of its duty of delivering this barge strictly in accordance with the contract of towage; it is only if the subsequent actions of the carrier in mistakenly assuring agents of the shipper who were on the ground looking at the barge that there was nothing to be concerned about gave rise to a new duty which was breached by them there could be support for the trial court's decree.

It is not questioned that if any person representing the shipper had been present any time of the day on Saturday with both the requisite knowledge of shipping matters and the authority to act the barge could have been pumped out and both cargo and barge saved. Instead of having such qualified person in charge when he himself knew the barge was in a leaking condition at the start of the voyage Frieler left inflexible instructions about unloading that prevented his own employees from using their own judgment for the safety of the vessel. We know of no case in admiralty which stands for the proposition that the owner can shift to another the liability for making a wrong judgment as to the measures necessary for the protection of such a craft after the carriage had come to an end.

We have carefully read the cases cited by appellant in support of its contention that "R.T.C., having been placed on notice of the leaking condition of the Peter B, was under the duty to exercise a high degree of care to protect the barge while in its custody and to so moor her that she was in no danger of sinking, or to stand-by and pump as required to prevent her from later sinking, until performance of such duty was excused."

These cases are Henry DuBois Sons Co. v. Pennsylvania R. Co., 2 Cir., 47 F.2d 172; Thorne, Neale & Co. v. Reading Co., 2 Cir., 87 F.2d 694; F. E. Grauwiller Transp. Co. Inc. v. Exner Sand & Gravel Corp., 2 Cir., 162 F.2d 90, and Curtis Bay Towing Co. of Virginia, Inc. v. Southern Lighterage Corp., 4 Cir., 200 F.2d 33. In none of these cases had there been a completion of the contract of towage followed by a delivery of the barge into the custody of the owner of the barge under circumstances which permitted ample opportunity for such owner to prevent loss to his barge and cargo. They do no more than announce the basic rule on the standard of care owing by the carrier to the barge which we have followed and which is stated in Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309, and the further proposition that if a tug accepts for towing a barge which is defective and is on notice of the defect this places an extra burden on the tug because the standard of care is increased to what is reasonable under such unusual circumstances.

The weakness of appellee's position here is that whatever standard of care was owed by R.T.C. to it for the towage was fully discharged, for the barge *was* delivered at its destination safe from damage resulting from any faults of towage. The defects of the barge which brought about her loss after her safe delivery could not be made the basis of a claim that the tug's liability extended beyond the point of her safe delivery.

---

3. Counsel agree that the cargo could be pumped out in a matter of several hours.

Appellee cites no case in admiralty which announces the principle that liability exists on the part of one who, as a volunteer, mistakenly advises one fully conversant with the true facts that his barge is in no danger of loss. We have found none.

The judgment must be reversed and a decree entered for no liability on the part of River Terminals Corporation.

Reversed.