**C. E. HART, Appellant,**

v.

**Thomas BLAKEMORE, Appellee.**

**No. 24100.**

United States Court of Appeals
Fifth Circuit.

April 21, 1969.

Egbert Beall, Charles E. Beall, Beall & Beall, Palm Beach, Fla., for appellant.

William C. Norwood, Fowler, White, Collins, Gillen, Humkey & Trenam, Miami, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

This action was brought by the libelant-appellee, Blakemore, to recover damages resulting from the allegedly negligent towing of his houseboat, "Uncle Tom's Cabin". The district court, having jurisdiction under Title 28 U.S.C. § 1333 (1), found that 75 percent of the fault should be attributed to the unseaworthiness of "Uncle Tom's Cabin" and 25 percent to the negligence of the respondent, Hart, who had furnished the tugboat and crew. Accordingly, a final decree was entered awarding Blakemore $10,112.00, from which Hart appeals. After careful review of the record, we conclude that the court's finding of negligence with regard to Hart was clearly erroneous, and reverse.

On October 13, 1964, "Uncle Tom's Cabin" was moored at the West Palm Beach Marina, which is located on Lake

Worth[1] in West Palm Beach, Florida. On this date Blakemore learned that a hurricane (Isabel) was approaching the area. He was warned that his houseboat was in danger of sinking if left at the marina on the west side of the open "lake" exposed to the northeast and east winds of the rapidly approaching storm. He immediately took steps to secure a safer mooring for his vessel. He was unable to contact his customary towing concern but on the following morning got in touch with Hart (or one of his employees) and made the necessary arrangements. It was agreed that the towing would be accomplished that afternoon, as the tug had already been secured in a canal 12 miles north of the marina and thus was not immediately available. The record indicated that the weather on this day was rough, with winds ranging from 20–40 miles per hour, increasing in intensity as the day wore on.

At 4:30 p.m. Hart went down to the marina to check on the arrangements. One of his employees, Jandreau, the captain of the tug, indicated that plans had been made to tow two houseboats from the marina, the second, smaller vessel to be towed behind "Uncle Tom's Cabin". The original plan had been to remove Blakemore's houseboat first and then return for the other vessel, but this plan was abandoned because the weather was progressively worsening, darkness was approaching, and the tenders of the several drawbridges along the intended route would soon be leaving their posts, making a return trip impossible. The tug left the marina at about 5 or 5:30 p.m. with the two houseboats in tow. Captain Jandreau testified that they had been underway for approximately thirty minutes when he noticed that Blakemore's vessel appeared to be taking on water. He put his deckhand aboard "Uncle Tom's Cabin" to determine the problem, but a thorough check was not possible as Blakemore had locked the cabin and the deckhand could not gain access to the interior. Realizing that the vessel was indeed sinking, Jandreau maneuvered the tug and the houseboats out of the deep waters of the inland waterway channel and managed to beach "Uncle Tom's Cabin" in a shallow, sand-bottomed area. During the ensuing storm, the vessel was damaged to the extent of $40,448.00.

■ The primary issue on appeal is whether the evidence in the record is sufficient to sustain the trial court's findings that the employees of Hart were negligent in failing to properly inspect and observe "Uncle Tom's Cabin" during the time that they were towing the vessel and that their negligence was a proximate cause of the damage sustained by the vessel. The appellant also contends that the trial court erred in holding void the written release executed by the parties which purportedly freed Hart and the tug from all liability of any kind and character, including any liability arising from the towing of Blakemore's houseboat. We find no error in the court's finding that the release was void on the basis that a contract to release one's self from the results of one's own negligence is contrary to public policy and unenforceable; that the release, even if enforceable, purported to release Hart for acts occurring prior to the signing and the loss occurred subsequent to the signing; and that Blakemore, due to conditions at the time of signing the release, was not in a position to refuse to sign it. The remaining errors asserted by the appellant do not have sufficient merit to justify discussion.

■ We note at the outset that the "clearly erroneous" rule of civil actions[2] was applicable to suits in Admiralty even prior to the integration of Admiralty and

---

1. Lake Worth is lake in name only. It is a tidal estuary separating the mainland from the offshore peninsula Palm Beach. It is about 22 miles north to south and averages ¾ mile west to east. It forms a part of the Intracoastal Waterway from Maine to Miami.

2. F.R.Civ.P. 52(a).

the Civil Rules July 1, 1966.[3] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). We have closely reviewed the record in this case, and we are left with such a conviction.

When questioned for an explanation of the vessel's taking on water, a marine surveyor, testifying as an expert witness for the libelant, noted that a series of small, fixed, louvered vents were situated across both the bow and stern ends of "Uncle Tom's Cabin". These vents, located just below deck level and approximately 2½′ to 3′ above water level, were designed to permit ventilation of the vessel's hull. The vents could not be closed, other than by covering them with plastic or boarding them up. The "Uncle Tom's Cabin" was towed on a short hawser because of the weather conditions, the narrow channel, and to permit clearing the drawbridges. The marine surveyor's expert opinion was that the backwash created by the tug's propeller entered the air vents at the bow of "Uncle Tom's Cabin" and filled the hull with water.

■ When the owner of a tug contracts to transport a tow and to take entire charge of its navigation, the owner of the tow is liable for its seaworthiness and the owner of the tug for its safe navigation. Curtis Bay Towing Co., Inc. v. Southern Lighterage Corp., 4 Cir. 1952, 200 F.2d 33; The Radnor, D.C.Md. 1927, 21 F.2d 982. Ordinarily, the tug is not an insurer of the tow, nor is the tug liable as a common carrier or subject as a bailee to any presumption of fault in case of damage or loss to the tow. The tug has an obligation to exercise the reasonable care and maritime skill that prudent navigators employ in per-

forming similar services, and the burden of proving negligence is on the party that asserts it. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); River Terminals Corp. v. Southwestern Sugar and Molasses Co., 5 Cir. 1960, 274 F.2d 36; Stall & McDermott v. The Southern Cross, 5 Cir. 1952,·196 F.2d 309.

■ The record indicates that "time was of the essence" in removing the houseboats from the West Palm Beach marina. The appellee Blakemore was at the marina when the tug arrived to tow "Uncle Tom's Cabin" away. He boarded his vessel, checked it over, locked it up and reported to Hart and his employees that it was "ready to go". He did not point out the air vents or suggest that they be covered. Hart testified that he quickly looked the vessel over and that "there was nothing unusual to be seen by looking at it". He explained that the air vents were not readily visible because they were below the level of the pier. The captain of the tug testified that the tug and tow had been underway for approximately thirty minutes when he noticed that "Uncle Tom's Cabin" appeared to be taking on water. He indicated that both he and his deckhand had kept the vessels in tow under close observation. The deckhand testified that he was stationed at the tug's stern and that he followed orders to keep watch on the houseboats and the stern lines.

If the record contained conflicting evidence with regard to the care exercised by the tug and its crew, we would be bound by the factual determinations of the trial court. There is no evidence in the record to support the finding below that those in control of the tug were negligent in failing to properly inspect and observe "Uncle Tom's Cabin" while it was under tow, nor is there evidence of a failure on the part of the operators of the tug to exercise such reasonable care and skill as prudent navigators

3. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Haynes v. Rederi a/s Aladdin, 5 Cir. 1966, 362 F.2d 345, 349; C. J. Dick

Towing Co. v. The Leo, 5 Cir. 1953, 202 F.2d 850; Colvin v. Kokusai Kisen Kabushiki Kaisha, 5 Cir. 1934, 72 F.2d 44. This case was tried June 2, 1966.

would employ in a similar undertaking. On the contrary, the record reflects that the captain and the deckhand exercised due care in towing the vessels and, when faced with an emergency situation, the captain responded with the only reasonable course of action. The beaching operation was the result of quick thinking and was carried out promptly and with commendable skill. It minimized the damages sustained by preventing a total loss of the tow.

The evidence in the record is insufficient to sustain the final judgment allowing damages against Hart. The judgment is reversed and the district court is directed to enter judgment for the appellant Hart.

Reversed.