422 F.2d 602
 HUMBLE OIL & REFINING COMPANY, Plaintiff-Appellee,
v.
The TUG CROCHET, her engines, etc., and M. L. Crochet Towing Co., Inc., Defendants-Appellants.
UNITED STATES of America, Defendant-Appellee,
v.
CARGILL, INC., Third Party Defendant-Appellant.
 No. 27118.
 United States Court of Appeals, Fifth Circuit.
 February 5, 1970.
 Rehearing Denied February 27, 1970.
 
 Tom F. Phillips, Frank M. Coates, Jr., Baton Rouge, La., Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., for Cargill, Inc.
 Charles E. Lugenbuhl, New Orleans, La., Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., of counsel, for M. L. Crochet Towing Co., Inc.
 Walter Carroll, Jr., Benjamin W. Yancey, New Orleans, La., Terriberry, Carroll, Yancey & Farrel, New Orleans, La., of counsel, for Humble Oil & Refining Co.
 Alan S. Rosenthal, Norman Knopf, Atty., Dept. of Justice, Washington, D. C., William D. Ruckelshaus, Asst. Atty. Gen., Alfred M. Farrell, Jr., New Orleans, La., Louis C. LaCour, U. S. Atty., Thomas F. McGovern, Trial Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for the United States.
 Before WISDOM, SIMPSON and CLARK, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 These appeals come from an action in admiralty for damage to a tug-pushed barge and its cargo resulting from a collision at a crossing on the Mississippi River with the wreck of a sunken barge which had been buoyed and lighted by the United States. The Court below[1] affixed liability against the pushing tug, its owner and the owner of the sunken barge. It exonerated the United States. We affirm.
 
 
 2
 Numerous negligence issues were joined by the pleadings. Humble Oil & Refining Company filed a libel in rem against the Tug CROCHET, and in personam against her owner, M. L. Crochet Towing Co., Inc. and against the United States, for damages received on August 27, 1964, when libelant's ESSO BARGE No. 261 struck the projecting portion of barge L-1 which had long been sunk in navigable waters of the Mississippi River in the vicinity of Mile 224 above Head of Passes at a point commonly known as Red Eye Crossing. Libelant alleged the tug and its owners were negligent in allowing the tow to strike a known, fixed object, and that the United States was negligent in failing to properly light or, in the alternative, to remove the wreck from the navigable portion of the river. Crochet Towing Co., individually and as claimant of the tug, admitted the collision but denied it was due to any act of negligence charged to it. It alleged that the collision occurred solely as a result of the joint negligence of the United States in failing to properly light and mark or to remove the sunken wreck and in failing to notify mariners that the marker light at the site of the wreck was inoperative, and of Cargill, Inc., as the owner of L-1, in failing to properly light and mark or to remove or destroy the wreck. A 56th Rule Petition was also filed by Crochet Towing Co. against the United States and Cargill, Inc. The United States denied in every particular the charges of negligence alleged against it and also cross-claimed against Cargill. Cargill denied any fault in connection with the original sinking of L-1 and claimed an abandonment of the barge. It further claimed that the United States was exclusively responsible for the buoying and marking of the wreck and that the collision sued on was solely the fault of the Tug CROCHET.
 
 
 3
 The pertinent facts center about, not one but, two collisions, separated in time by about three and one-half years. In March of 1961 Cargill, Inc., through its wholly owned subsidiary, Cargo Carriers, Inc., operated a general fleeting service at a point known as Red Dog No. 1, located at Jackson's Landing (Mile 227.5 AHP). At about 9:00 P.M. on the evening of March 30, 1961 the barges L-1 and M-65, then owned pro hac vice and operated by Cargill, were moored into this fleet by the Tug ISABEL GARRETT, which was then being operated under a fully found charter to Cargo Carriers. The fleet was serviced at that time by a harbor tugboat, the JOHN E. COON, also operated under a fully found charter to Cargo Carriers. In the regular course of their day to day management of the fleeting service, personnel of Cargo Carriers wrote both standing orders and special orders which were to govern operations. The standing orders required clean, filled, brightly burning kerosene lanterns to be placed and securely tied at the bow and stern of each outboard barge, and required inspections of the fleet to be made as frequently as possible but never less frequently than twice a night. The special orders for the fleet for the night of March 30 stated, in part, "* * * we do not want any barges in the position of W-2, last high water. So be sure that the barges are properly tied and afloat. The water is expected to rise another foot over the weekend. * * *" Cargo Carriers' manager, who had charge of the fleet on the night of March 30, appeared as a witness in the court below. To the best of his knowledge no inspection was ever made of the manner in which L-1 and M-65 were tied off or equipped — assertedly because just after they arrived fog set in "and no one could get to them". The events which took place in Cargo Carriers' fleet during the rest of this evening and the early morning hours of March 31, if known, are not shown in this record, but at approximately 6:00 A.M. on March 31 the harbor tug, JOHN E. COON, notified the fleet manager that the ESSO ZURICH had collided in the night with the barges L-1 and M-65 at Red Eye Crossing. The statements of the pilot and captain of the ESSO ZURICH showed the barges were not sighted and no lights or other indication of their presence was detected by her lookouts prior to the collision. When the manager then inspected the shore barge which remained in his fleet he found remnants of broken mooring lines hanging from this barge. The wreck of the barge L-1 came to rest approximately one hundred feet east of the east edge of the fifteen hundred foot channel regularly maintained by the United States in Red Eye Crossing, in water estimated to be between sixteen and twenty feet deep — obviously navigable in fact even at low water. It was marked and lighted by Cargill from the date of this sinking until April 1962. From April 28, 1962, L-1 was marked and lighted by the U.S. Coast Guard. A new, properly equipped, lighted marker buoy was placed on location near L-1 on July 15, 1964 by Coast Guard personnel. This buoy was on its proper station at the time of the collision.
 
 
 4
 The circumstances surrounding the collision giving rise to the present litigation were established by the testimony of the Captain and the relief pilot of the Tug CROCHET. On August 27, 1964, the CROCHET left the Humble Oil Company's Esso dock about 5:00 P.M. headed down river, bound for Mobile, with ESSO BARGE 261 loaded with asphalt made up ahead. The tug's crew consisted of a captain, a relief pilot and a deckhand-cook; there was no crew on the barge. The captain was at the wheel of the tug. When the flotilla reached a point just above and within sight of Red Eye Crossing, a radio message recalled the tug to the Esso dock for further testing of the cargo, but before returning the captain pointed out the red buoy marking the location of the sunken barge L-1 to the relief pilot, Gillis Naquin. The sun was shining brightly enough so that it was not possible to then tell whether the light on the buoy was operating. The flotilla returned to the Esso dock and remained there until the requested testing procedures had been completed. About 10:00 P.M., CROCHET, made up as before, again headed down river bound for Mobile. The captain and the deckhand-cook went to bed, and when the flotilla arrived at Red Eye Crossing, Relief Pilot Naquin was the only person on the vessels who was awake.
 
 
 5
 Naquin estimated he had been through Red Eye Crossing about seven times previous to this night. This trip, however, was his first service aboard the CROCHET other than as a deckhandcook. Before this trip he had had approximately six hours total experience in piloting towboats. Just before he reached the vicinity of Red Eye Crossing Naquin completed a starboard to starboard pass with an upbound tow. Visibility in this immediate area was then impaired by a low haze upon the river. Naquin could not readily sight the red flashing buoy light which marked the location of the wrecked barge so he reduced his speed while attempting to locate the buoy, which he said he planned to use in navigating the crossing. Even though he couldn't see the buoy or its light, Naquin was able to see the two range lights on the west bank of the Mississippi River which marked the center of the channel through Red Eye Crossing, and he was also able to see the lights on an illuminated overhead power line which he knew to be a very short distance upstream of the barge wreck and its buoy. He also could see the lights of two upbound boats in Missouri Bend, below Red Eye Crossing. He stated it was his intention to make starboard to starboard passes with these tows also; presumably this was to explain why he was on the east side of the river. Yet, on his initial cross-examination as an adverse witness, Naquin testified that when he got to the illuminated overhead power line crossing he ran straight for the range light on the west river bank and that this placed him a little bit upstream from the center of the channel. However, he subsequently testified that he spent between 25 and 30 minutes drifting at reduced speed and searching for this buoy, both with and without the help of the tug's searchlight, and that while vainly searching for the wreck buoy, he knew he had allowed the current to take his flotilla down river well below the illuminated overhead power crossing and beyond the shore-based range lights. It is also obvious from the undisputed physical facts that the current must have moved CROCHET and her tow well away from any intended downstream course because it was the starboard side of ESSO BARGE No. 261 that stranded on the L-1. During the period when he was lost and adrift Naquin never tried to awaken the captain or the deckhand-cook. They did not wake up until the collision occurred. When they did come out on deck, Naquin's shipmates showed him the wreck buoy which was about 300 feet southwest of the point of collision. When asked what navigational use he would have made of the buoy he spent so long looking for if he had found it, Naquin at first replied: "I can't answer you"; then he stated that he had just wanted to be sure he passed it to the right. The battery-operated light on the buoy was not operating at that time. Subsequent inspection showed the buoy had been struck by some object and its light switch was stuck in the off position. The United States had no knowledge or notice that the flashing light on this buoy was not operating correctly until after this collision.
 
 
 6
 The District Court found that the L-1 sank on March 31, 1961 as a result of the failure of Cargill to provide adequate mooring lines, lights and watchmen, that the pilot of the CROCHET was negligent in his August 1964 attempt to navigate through Red Eye Crossing and that no negligence of the United States caused or contributed to the latter collision. A joint judgment as to liability only was entered in favor of Humble against Crochet Towing Co., its Tug CROCHET and Cargill.
 
 
 7
 The findings of fact by the trial court cause may only be set aside by an appellate court when they are clearly erroneous.[2] Under this test the finding of negligence against CROCHET may not be reversed. Indeed, on the facts at bar, a contrary finding could not stand. While a tug is not an insurer of its tow nor generally subject as a bailee to any presumption of fault,[3] when she strands her tow under circumstances which ordinarily result in no such casualty, she has the burden of producing evidence which shows a reasonable excuse other than her own negligence.[4] When CROCHET stranded her tow in calm weather on a well-known wreck outside a quarter-mile wide channel marked and maintained for regular navigation, she had the burden of explaining the occurrence. Certainly it could never be contended that proof that the craft was solely entrusted to an unlicensed, relatively inexperienced hand who was unable to use navigation charts, would carry this burden. If anything, such proof would show additional fault and possibly carry the plaintiff's burden of proof against the tug. Showing that this incompetent employee spent approximately half an hour adrift at night amidst two known, visible shore-based navigational aids without seeking experienced help, without stopping and backing his craft, and while searching through a haze for a less reliable buoy of only secondary importance to the navigation problem at hand, would be ample to justify holding the tug and her owners liable for the almost inevitable stranding of her tow. Grounding the starboard side of the barge against a wreck located outside the port side limits of the channel — a wreck which the pilot knew was in the immediate vicinity of his drifting vessel — puts the fault of CROCHET beyond cavil.
 
 
 8
 The fact that the light on the wreck buoy was inoperative at the time of this collision does not excuse this negligence. Common sense and regulations tell even landlubbers that floating aids to navigation are liable to be carried away or disabled through natural causes or accidents and are not as reliable as shore-based navigation aids.[5] Nor does the fact that the wrecked barge was left in a portion of the river which was navigable in fact and in law[6] excuse CROCHET. The wreck was a well known hazard to navigation. Its presence is analogous to piers, bridges, rocks, shoals or similar known fixed objects.
 
 
 9
 The finding that the United States was guilty of no negligence causing or contributing to the collision between ESSO BARGE No. 261 and L-1 is not erroneous. On the contrary, it is amply supported by this record. If the United States had any direct responsibility when Cargill attempted to abandon the wreck of L-1, it at least had the option to remove or destroy the wreck or to properly mark and light it.[7] It chose the latter course. The wreck buoy, in proper operating condition, had only recently been replaced and was on station at the time of the collision. The United States had no notice or knowledge that the light on the buoy had been struck or was inoperative. Any liability of the United States must necessarily have been predicated upon proof that the accident was caused by its failure to use due care in buoy placement and maintenance or by its lack of due care in allowing a defective buoy to remain on station for an unreasonable time after actual or constructive notice of such defect[8]. The record here shows the opposite.
 
 
 10
 The sinking and the subsequent disputes and wrecks which have ensued from the wreck of Cargill's barge L-1 have already occupied the time of many a court and litigant.[9] The court below has now added the final sentence to another chapter in this saga with its finding that L-1 and M-65 went adrift and were sunk because Cargill failed to provide adequate mooring lines, lights and watchmen. We affirm this finding because it is supported by credible evidence and is not clearly erroneous. Cargill here seeks to avoid its resulting liability by asserting that the services of proper mooring and lighting had been contracted to others in the form of fully found charters it had made with the Tugs ISABEL GARRETT and JOHN E. COON. Without making or intimating any decision on the respective rights and duties of Cargill and its charterers, we hold Cargill cannot excuse its fault and any damages to the libelant caused thereby on such a basis. The combination of a rising river height with its attendant dangers of increased floating debris and strain on lines together with foggy conditions hampering tug work, created a situation which those who choose to operate a business on the Mississippi River ought to anticipate. Moreover those operating the Red Dog No. 1 fleeting service actually knew a condition of potential danger existed requiring special precautions and, as it must, Cargill admits its responsibility for the actions of its wholly-owned subsidiary, Cargo Carriers, in the operation of this facility. A rise in the river was expected and specific warnings were written to cover the fully anticipated hazards. The fact that fog made tugboat operations difficult or impossible only heightened the fleet service's duty to inspect moorings and lighting procedures with shore-based personnel, if necessary. This artery of commerce maintained by the national government for the general use of the public certainly places no lesser burden on its users than would a public road on land. Cargill could not turn its corporate back on such conditions and rely solely on charter contracts with independent contractors to insulate it from the consequence of known danger becoming disaster. Its duty to the public using the river highway was, under these circumstances, non-delegable.[10]
 
 
 11
 When a vessel is wrecked in a navigable stream due to the negligence of its owner, it cannot be abandoned to the United States and its owner remains liable for all damages resulting from its continued interference with navigation.[11] The holding of the court below that Cargill was negligent as to mooring, lighting and inspecting L-1 and M-65, which we here affirm, thus places Cargill in direct violation of Section 15 of the Wreck Act.[12] When this statute is read with a negligent owner in view, its operative provisions are:
 
 
 12
 "It shall not be lawful * * * to * * * carelessly sink * * * vessels * * * in navigable channels * * *. And whenever a vessel * * is [so] wrecked and sunk in a navigable channel * * * it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed * * * and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently * * *."
 
 
 13
 Cargill contends that if the United States was not negligent in lighting and marking this wreck, then Cargill cannot be held liable here, because once the government assumes marking and lighting, a private party cannot interfere with or control such activity.[13] This rationalization while partly true, does not dispose of the case at bar. With the right of abandonment eliminated from its terms, Section 15 makes it plain that the owner of a vessel negligently wrecked in a navigable channel does not have the option which belongs to the sovereign, of either buoying and lighting or removing such a wreck. Cargill, because of its negligence, had and continues to have the double duty (1) to immediately buoy and light the wreck and (2) to commence the immediate removal of the same and prosecute such removal diligently. While lighting and marking by the United States relieves a private party of this function, it does not relieve the owner of a negligently sunk wreck of his additional immediate and continuing duty to remove the obstruction to navigation. Merely showing the date of the sinking of L-1 and the date of the collision of ESSO BARGE No. 261 is enough to prove Cargill's statutory fault in failing to promptly remove the wreck under Section 15.
 
 
 14
 All that remains to be decided is whether Cargill's failure to remove the wreck of L-1 was a contributory fault to the damages sustained by libelant. We hold it was. If a prior fault directly tends to cause a collision, it becomes a contributory fault.[14] The fact that Cargill's fault is statutory adds a burden in the admiralty context which would not be present at common law. As a party guilty of statutory fault, Cargill could be held to have had the burden of showing not merely that its fault might not have been one of the causes, or that it probably was not, but that it did not have any causal relation to the wreck. Almost one hundred years ago the Supreme Court held that such a strict rule was necessary to enforce obedience to the mandate of statutes designed to keep navigation safe.[15] This rule has a rational application to Cargill's nonfeasance here. However, it is unnecessary to rely upon the rule of The Pennsylvania here and hold that Cargill had the duty to demonstrate that its negligence did not have a causal relation to the wreck; the proof in the record adequately shows that Cargill's statutory fault in not removing the wreck of L-1 was a contributing fault to the damage suffered by Humble.[16]
 
 
 15
 Cargill's failure to promptly remove L-1 endangered navigation of the river and left an inherent, imminent and impending danger in a national water highway.[17] With Naquin's negligence operating in the absence of the wreck, we recognize that the CROCHET still might have grounded her tow on a sand bar; but it was equally possible that she might have recovered her bearings and passed safely through Red Eye Crossing. In any event, she was entitled to that additional reach of navigable water adjacent to the regular fairway which L-1's unlighted wreck denied her on the night of August 28, 1964. Cargill's fault combined with the negligence of the crew of the CROCHET to cause this collision, therefore both are equally liable to Humble for the damages which ensued.
 
 
 16
 Since the court below has not yet determined the necessity vel non for further proceedings as to damages, we remand this cause to that court for such further action as may be required.
 
 
 17
 Affirmed and remanded.
 
 
 
 Notes:
 
 
 [1]
 288 F.Supp. 147 (E.D.La.1968)
 
 
 [2]
 Rule 52(a), Fed.R.Civ.Pro.; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Byrd v. M/V Yozgat, 420 F.2d 954 (5th Cir. 1969); East-West Towing Company v. National Marine Service, Inc., 417 F.2d 1274, (5th Cir. 1969); Hart v. Blakemore, 410 F.2d 218 (5th Cir. 1969)
 
 
 [3]
 Hart v. Blakemore, 410 F.2d 218 (5th Cir. 1969)
 
 
 [4]
 Bisso v. Waterways Transportation Co., 235 F.2d 741 (5th Cir. 1956)
 
 
 [5]
 33 CFR 62.15.1; 33 CFR 62.25.55; see also the cautionary notes in the Light List, Vol. II, Atlantic and Gulf Coast of the United States, CG-160; and Bowditch, American Practical Navigator, p. 266 (1958)
 
 
 [6]
 33 U.S.C.A. §§ 2.10-5(a) and 2.20-5(a) (Supp.1969); see also Reading Co. v. Pope & Talbot, Inc., 192 F.Supp. 663 (ED Penn.1961), aff'd 295 F.2d 40 (3d Cir. 1961)
 
 
 [7]
 Buffalo Bayou Transportation Co. v. United States, 375 F.2d 675 (5th Cir. 1967)
 
 
 [8]
 Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)
 
 
 [9]
 A part of the legal history can be found in the following reported cases: United States v. Cargill, Inc., 367 F.2d 971 (5th Cir. 1966), affsub nom, Wyandotte Transp. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed. 407 (1967); Buffalo Bayou Transp. Co. v. United States, 375 F.2d 675 (5th Cir. 1967); Humble Oil & Ref. Co. v. M/V John E. Coon, 207 F.Supp. 45 (ED La. 1962); In re Humble Oil & Ref. Co., 306 F.2d 567 (5th Cir. 1962); Humble Oil & Ref. Co. v. Bell Marine Services, 321 F.2d 53 (5th Cir. 1963); Ex parte Tokio Marine & Fire Ins. Co., 322 F.2d 113 (5th Cir. 1963).
 
 
 [10]
 Restatement (Second) of Torts, § 418 (1965)
 
 
 [11]
 Wyandotte Transportation Co. v. United States, supra, Note 9
 
 
 [12]
 Rivers and Harbors Appropriations Act of 1899, specifically, 33 U.S.C.A. § 409
 
 
 [13]
 Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665 (2d Cir. 1951)
 
 
 [14]
 For examples of instances in which fault in allowing a stationary object to block navigable waters was considered a contributing fault to a subsequent collision, see Griffin on Collisions, § 219
 
 
 [15]
 The Pennsylvania v. Troop, 19 Wall (86 U.S.) 125, 22 L.Ed. 148 (1873)
 
 
 [16]
 Had Cargill's duty under the statute been judicially declared at the time of the wreck in suit, we would have no reluctance to place our affirmance as to Cargill solely on the basis ofThe Pennsylvania rule.
 
 
 [17]
 These are the apt terms in which this Court, two and three years ago respectively, specifically referred to the wrecked hull of L-1 at Red Eye Crossing. See Buffalo Bayou Transportation Co. v. United States and United States v. Cargill, supra, Note 9