**TIDEWATER MARINE ACTIVITIES, INC., Plaintiff-Appellee,**

v.

**AMERICAN TOWING COMPANY, Inc., and the TUG JELENA ANN, its tackle, apparel, furniture, etc., Defendant-Appellant.**

**No. 29835**

**Summary Calendar.** *

United States Court of Appeals, Fifth Circuit.

Dec. 30, 1970.

---

* [1] Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir. 1970, 431 F.2d 409.

Cornelius G. Van Dalen, William S. Stone, New Orleans, La., for defendant-appellant; Deutsch, Kerrigan & Stiles, New Orleans, La., of counsel.

Charles E. Lugenbuhl, New Orleans, La., for plaintiff-appellee; Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., of counsel.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

PER CURIAM:

This suit in admiralty was brought by the appellee, Tidewater Marine Activities, Inc., to recover damages resulting from the allegedly negligent towing of its Quarterboat "BUDDEE." The district court found that appellant, American Towing Company, Inc., owner of the Tug "JELENA ANN," was negligent and awarded damages of $25,703.76. Appellant appeals from that determination and argues (1) that as a matter of law either the Tug was not negligent or the Quarterboat "BUDDEE" was itself unseaworthy; and (2) that the damages were excessive. Finding the district court's opinion supported by the evidence and not "clearly erroneous," Fed.R.Civ.P. 52; Hart v. Blakemore, 5 Cir. 1969, 410 F.2d 218, 220–221; Chitty v. M/V Valley Voyager, 5 Cir. 1969, 408 F.2d 1354, 1357; see McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, we append it herein and adopt it as the opinion of this court.

The judgment is affirmed.

## APPENDIX

United States District Court
Eastern District of Louisiana
New Orleans Division
No. 7622 in Admiralty Division "A"
Tidewater Marine Activities, Inc.

versus

American Towing Company, Inc., and the Tug Jelena Ann, its tackle, apparel, furniture, etc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This suit in admiralty involves a claim for property damages sustained by the plaintiff when its Quarterboat BUDDEE sank on September 28, 1964, while in tow of the defendant's vessel, the Tug JELENA ANN, in Bayou Boeuf near Morgan City, Louisiana. Plaintiff claimed damages proximately caused by the negligence of the defendant in the operation of the tug in several particulars. American Towing Company, Inc., defendant, owner of the Tug JELENA ANN, answered, denying liability, and urging affirmatively that plaintiff breached its warranty of seaworthiness when the Quarterboat BUDDEE was tendered for towage. The case was tried to the Court, sitting in admiralty, and after considering the evidence, the Court makes the following

## FINDINGS OF FACT

### 1.

At all times hereinafter involved:

(a) Plaintiff, Tidewater Marine Activities, Inc., was a corporation organized and existing under the laws of the State of Louisiana, and was, on September 28, 1964, the owner of the Quarterboat Buddee.

(b) Defendant, American Towing Company, Inc., a corporation organized under the laws of the State of Louisiana, was, on the said date, the owner of the Tug JELENA ANN, a documented vessel of the United States with register dimensions of length, 51.5′; breadth, 17.9′; and depth, 7.0′, powered by two General Motors Diesel Engines, 300 horsepower each.

### 2.

The Quarterboat BUDDEE was a typical shallow water quarterboat used to feed and house crews. She had a steel hull, measuring 23′ in width by 56′ in length, with a hull depth of 3 feet. Wooden flooring on metal braces supported the wooden housing superstructure. A watertight flashing connected the main outside steel deck and the superstructure. The barge was divided into four main compartments, and there was a sponson on each side, each having two fresh water compartments and two rake compartments. All hatches on the sponson compartments were watertight. The hatches on the four main compartments were of a flange type fitting over the raised coaming. The hatches on the bow and stern were readily visible and accessible. On September 28, 1964, the BUDDEE had approximately 18 inches freeboard. She was equipped with towing knees at the bow, which projected approximately 4′10″ above the water line.

### 3.

The Barge B-7 was a double raked barge measuring 100′ x 28′ x 6′6″. In her empty condition on September 28, 1964, she drew approximately 1′, leaving a freeboard of 5′6″.

### 4.

Prior to September 28, 1964, plaintiff, through its officers, had entered into an agreement with Berry Bros. for the use of the Quarterboat BUDDEE. The BUDDEE was to be rented to Berry Bros. on a bareboat charter basis for a period of two months at a daily rate of $37.50. Berry Bros. had used the BUDDEE on other occasions, and was to provide towage from Tidewater Marine Activities' slip in Morgan City, Louisiana, to the scene of its operations.

### 5.

Berry Bros. contacted defendant, American Towing Company, and made

arrangements for the Tug JELENA ANN to tow the Quarterboat BUDDEE and the Barge B-7 from Tidewater's slip to location. Plaintiff had nothing to do with the selection of the tug or the towing arrangements.

6.

The Tug JELENA ANN arrived at Tidewater's slip sometime shortly after 3:00 p. m. on September 28, 1964, and took into tow the Quarterboat BUDDEE and the Barge B-7. Under the orders of the Master of the JELENA ANN, the tow was assembled. The Barge B-7 was placed in the lead and the Quarterboat BUDDEE was made up astern of the Barge B-7, with a distance of approximately 12 inches between the stern of the B-7 and the bow of the BUDDEE. The JELENA ANN made up to the bow of the B-7 on a short towing hawser. The towing knees of the BUDDEE barely reaches the stern rake of the Barge B-7.

7.

There is some dispute as to the circumstances surrounding the arrival of the JELENA ANN at Tidewater's slip and the condition of the BUDDEE at that time. Captain Burtney J. Dupre, the Master of the tug, did not appear in Court, but his de bene esse deposition was offered by defendant without any explanation as to Dupre's whereabouts at the time of trial. Dupre testified that when his vessel arrived at the slip, he saw the BUDDEE being pumped. He claimed that Captain Courville, Captain of the Dredge WAL-DA-VICK, and Gordon Thibodaux, a maintenance man, told him that the BUDDEE was being pumped because rain water had gotten into her hull. Courville denies being present at the time the JELENA ANN arrived and denies specifically any conversation with Dupre on the day of the casualty. Thibodaux admits being present but testified that Courville had left the yard. According to Thibodaux, all that transpired between himself and Dupre was his comment to Dupre that the two vessels were ready to be taken in tow. Clar-

ence Dupuy, a boatman employed by Tidewater Dredging Company, who was present at the time the JELENA ANN arrived, confirmed that Courville was not present. All three witnesses produced by plaintiff, Courville, Thibodaux and Dupuy, testified positively that the Quarterboat BUDDEE had not been pumped on the day of September 28, 1964. Courville, in fact, testified that he had checked all of the hatches and that there was no water in any of the compartments. I am impressed by their testimony and reject Dupre's version. I therefore find from the credible evidence that the Quarterboat BUDDEE had not been pumped and was free from water in her hull at the time the JELENA ANN arrived. All of the witnesses, including Dupre, testified that the BUDDEE was riding on an even keel with no list and appeared to be in a reasonably good condition.

8.

Dupre admitted that he did not check the hatches, nor did he or his deckhand make any inspection of the BUDDEE to determine her condition. It is uncontradicted that under Dupre's direction, the tow was made up with the Barge B-7 placed at the lead and the Quarterboat BUDDEE made up astern. From Dupre's own testimony, it is apparent that he could not see the deck of the BUDDEE from his position in the wheelhouse. No employee of plaintiff participated in the make-up of the tow and Dupre did not ask anyone in plaintiff's employ any questions concerning the condition of the barge or the manner in which it should be towed. I find that the manner in which the tow was made up, particularly with respect to the inability of the Master of the JELENA ANN to see the deck of the Quarterboat BUDDEE, was as done solely under the direction and control of the defendant through its agent, Dupre.

9.

According to the charts offered in evidence and the testimony of the witnesses, Tidewater Marine Activities, Inc.'s slip is

located at Mile 93 in the Intracoastal Waterway. It is undisputed that the Tug JELENA ANN, with the tow made up as indicated above, departed that slip at 3:30 p. m. on September 28, 1964. Dupre entered this time in his log and this is confirmed by the log kept by Tidewater's employee, Courville.

### 10.

The JELENA ANN proceeded into Bayou Boeuf from Tidewater's slip at full speed. According to Dupre, no lookout was posted on the Barge B-7 to advise him of the manner in which the Quarterboat BUDDEE was riding, and although he looked back several times, he was unable to determine the effect of his wheelwash or the turbulence from the Barge B-7 on the bow rake of the Quarterboat BUDDEE. He could not see that deck and was not concerned about it. As the flotilla passed Bayou Ramos, he felt a "sudden jerk" and turned around to look at his tow and saw the Quarterboat BUDDEE sinking on his port side. The Quarterboat BUDDEE sank almost immediately. According to Dupre, the site of the sinking was at Mile 90.8, although other witnesses placed it at Mile 90.3 or thereabouts. Dupre logged the time of the sinking at 3:45 p. m. and this is corroborated by Courville's testimony that he was called by a female employee of the defendant at 3:45 p. m. and told that the tow was sinking. I find that the tow sank within fifteen minutes of departure with the entire flotilla having travelled a distance in excess of 2.2 miles. There was no evidence of any other vessel in the area at the time of the sinking and the weather was clear and the seas calm.

### 11.

The day after the sinking, the barge was raised and it was found that she had sustained crushing damage to her port bow and port side, including damage to the cabin on that side, together with damage to the cavils, handrails and stanchions on the bow area and down the port side. It was also uncontested that

the steel hull of the Quarterboat BUDDEE did not leak after she was raised. The defendant's own surveyor, Mr. Duval, confirmed in his report and in his testimony that there were no leaks found in the hull after the barge was raised. The watertight integrity of the hull itself is unquestioned.

### 12.

Defendant makes much of the condition of the Quarterboat BUDDEE. In support of this defense, defendant attempted to show that the Quarterboat BUDDEE was old and deteriorated. I find, however, that despite the age of the quarterboat, the BUDDEE was in fact seaworthy and reasonably ready and reasonably fit for the purpose intended and ready to be towed in a normal manner. Her hull was in fact watertight; this is confirmed by the testimony of plaintiff's witnesses, both before the accident and by all of the witnesses as to her condition after the accident. She had 18 inches of freeboard, which, according to the defendant's own marine surveyor, is more than many barges have for operations in sheltered waters. Despite the condition of her woodwork, whatever that might have been, it is obvious that the steel hull of the BUDDEE was amply watertight and sufficient to support the house and to maintain its way through the water if reasonable precautions were used for her safety. Dupre certainly made no complaint to Tidewater and in his own testimony, he admitted that he was not "worried about the condition" of the BUDDEE and that it did not appear to be "in bad shape". I must conclude that the evidence established overwhelmingly the reasonable fitness of the Quarterboat BUDDEE for towage.

### 13.

The credible testimony clearly establishes negligence on the part of the towing vessel, the JELENA ANN, and her master. Dupre placed the BUDDEE, with a freeboard of only 18 inches, in a position where the deck of that barge could not be observed from his pilot-

house. He posted no lookout to advise him of the manner in which the BUDDEE was riding behind the Barge B-7. The lines between the BUDDEE and Barge B-7 were not tight and the towing knees barely reached the rake of the barge. The testimony of the defendant's own surveyor, Mr. Duval, with limited towage experience, confirms that this make-up was improper. Mr. Duval admitted that it was essential for a Master to see the hull of the quarterboat and that if it could not be seen from the pilothouse of the tug, a lookout should have been stationed aft. This same view was taken by plaintiff's witness, Mr. Courville, who had considerable experience in towage. It was his opinion that the make-up of the tow was improper, particularly since the Master of the JELENA ANN could not see the deck of the quarterboat. With the tow made up as he directed, Dupre, notwithstanding the fact that he could not see the deck of the quarterboat, and that he had made no check of the hatches of the quarterboat, proceeded into Bayou Boeuf. By his own testimony, he travelled from a dead stop to sinking, a distance of 2.2 miles, in fifteen minutes, at an average speed, at the very least, of 8.8 miles per hour. The testimony of other witnesses would place the speed at an even higher rate. Duval thought a maximum speed was 8 miles per hour. It is obvious to me and I so find that the speed maintained by the JELENA ANN for this brief fifteen minutes of time was excessive, particularly in view of the make-up of the tow and the lack of any precautions to determine whether or not the Quarterboat BUDDEE was in a safe position and riding properly.

### 14.

Defendant, through its expert, Duval, suggested some theory of either an explosion or some warm weather pressure phenomena. I reject this theory as not being proved or applicable to this case. Under cross-examination, Mr. Duval ultimately admitted that "it was highly possible" that water either came over the deck of the BUDDEE because of wheel-wash or turbulence or because the speed of the flotilla forced the bow down. In view of the condition of the hull after the raising, it is obvious to the Court that water had to enter the hull from the top and that this was caused by a combination of the make-up of the tow and the excessive speed at which Dupre proceeded. There is also a very strong possibility that one of the lines securing the Quarterboat BUDDEE to the Barge B-7 parted, causing it to twist under the rake of the higher Barge B-7, damaging her port side and pushing the bow of the BUDDEE down under the rake of the B-7 to a point where water was forced into her hull from the top. I find that this occurred. I consider it immaterial whether the parting of the rope occurred before or after water was actually coming over the deck of the BUDDEE. It appears that a combination of the make-up of the tow, the speed, the manner in which the quarterboat was secured, and the parting of the line or the twisting of the Quarterboat BUDDEE all contributed to the sinking.

### 15.

All of the causes of the sinking of the BUDDEE could have been avoided by the exercise of reasonable care on the part of the JELENA ANN. The BUDDEE had been in service for many years and had never sunk in tow previously. Dupre candidly admitted, when asked why he did not have his deckhand look at the BUDDEE to see how it was riding, that he "didn't think of that". His candid admission indicates his total lack of care —he simply picked up the tow and "took off".

### 16.

Mr. Arthur Grant, a marine surveyor, concluded that the fair market value of the BUDDEE was $22,000.00 as of the date of its sinking. This was corroborated by plaintiff's witness, Mr. Herman Vick. Further, this value is corroborated by the independent negotiations between plaintiff and Berry Bros. regarding the

charter of the barge, when the parties stipulated an agreed value of $22,000.00 for insurance purposes. I therefore find the fair market value of the BUDDEE was $22,000.00 and that she was a total loss. She has not been repaired after raising and there was no evidence offered by defendant that her hull has any value.

### 17.

It is undisputed that plaintiff expended the sum of $3,259.51 in raising the vessel and additionally was required to pay to defendant the sum of $444.25 for tug standby time during the salvage operations.

### 18.

The deckhand of the JELENA ANN did not testify nor was any explanation offered for his failure to testify.

## CONCLUSIONS OF LAW

### 1.

The Court has jurisdiction of this action in admiralty and venue is properly laid in the Eastern District of Louisiana, New Orleans Division.

### 2.

■ A tug is not liable as an insurer or as a common carrier. The tug owes a duty to its tow to exercise reasonable care and that degree of maritime skill which prudent navigators employ in performing similar services. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); River Terminals Corp. v. Southwestern Sugar and Molasses Co., (5 Cir. 1960) 274 F.2d 36; Stall & McDermott v. The Southern Cross, (5 Cir. 1952) 196 F.2d 309; Hart v. Blakemore, (5 Cir. 1969) 410 F.2d 218. The credible evidence in this case confirms that the JELENA ANN and its crew did not exercise that degree of reasonable care and skill demanded of them. In fact, the evidence compels a finding that no care or skill was utilized by Dupre. The Master of the JELENA ANN was negligent in the manner of the make-up of the tow, particularly in the respect in which he was unable to see the deck of the Quarterboat BUDDEE because of the larger empty barge intervening between his vessel and the BUDDEE. His speed was excessive and he made no effort to check the barge or to determine in any manner how it was riding.

### 3.

■ There was no breach of warranty on the part of plaintiff to tender a seaworthy barge. I conclude that the barge was reasonably fit for the towage and that it could have been safely transported had a reasonable degree of skill been exercised by defendant's employees. Even if the defendant's argument concerning the condition of the superstructure of the BUDDEE is accepted, which I do not accept, this would increase the duty of care owed by defendant. When the tower is placed on notice of either an unseaworthy condition or of some other fact which might influence the towage, it cannot complain—it must use reasonable care under those circumstances. As was said in Bisso v. Waterways Transportation Co., (5 Cir. 1956) 235 F.2d 741, "it was this vessel, in this trim, in this shape, which *Kevin Moran* undertook to tow". See also The MARGARET G—MERCER, (2 Cir. 1931) 47 F.2d 172; River Terminals v. Southwestern Sugar & Molasses Co., (5 Cir. 1960) 274 F.2d 36; Southwestern Sugar & Molasses Co. v. River Terminals, D.C., 153 F.Supp. 923.

### 4.

It is unquestioned that the burden of proof in this case was on the plaintiff. I conclude that the plaintiff carried its burden of proof of the negligence on the part of the towing vessel. I also conclude that the tug, in the face of strong evidence of negligence on its part, offered no evidence in rebuttal of plaintiff's prima facie case and showed no reasonable excuse for the accident in question other than its own negligence. Bisso v. Waterways Transportation Co., supra.

5.

The BUDDEE was a total loss and plaintiff is entitled to the fair market value of the vessel, $22,000.00, together with the cost of raising, $3,259.51, and the cost of towing, $444.75. The Clerk will prepare a Judgment accordingly.

New Orleans, Louisiana.

March 10, 1970

/s/ James A. Comiskey
UNITED STATES
DISTRICT JUDGE