UNITED STATES of America as owner of THE BYRON DARNTON, Libelant,

v.

The BULL STEAMSHIP LINE, Respondent.

United States District Court
S. D. New York.
April 30, 1956.

J. Edward Lumbard, U. S. Atty., by Walter L. Hopkins, New York City, for libelant.

Atkins & Weymar, by Horace Atkins, New York City, for respondent.

BONDY, District Judge.

The United States of America, as owner of the S. S. Byron Darnton, brought this libel against the Bull Steamship Line, for damages alleged to have been sustained by the libelant through the negligence of the respondent.

The respondent, the Bull Steamship Line, was engaged in the business of providing stevedoring service. Pursuant to Contract Warshipsteve No. WSA–72333–DA–653, the respondent loaded a cargo of steel plates into the No. 4 lower

hold of the Byron Darnton between January 10 and 17, 1946, at Baltimore, Maryland.

■ The libelant alleges that sometime during the loading by the respondent's stevedores one of a large number of steel plates was so negligently handled that it punctured the forward wooden sheathing of the No. 4 lower hold and the steel bulkhead of the adjacent No. 3 deep tank used for the storage of fuel oil and that as a result of these punctures 12 feet above the bottom of the No. 4 lower hold the cargo of steel plates in that hold, stowed to a height of 5 feet, was damaged by fuel oil seeping through the punctures into the hold from the No. 3 deep tank. The respondent denies that any of its stevedores caused such damages to the ship or the plates.

The respondent contends that the punctures existed before its stevedores entered the hold and that the punctures may have existed on or before July 21, 1945, when at Venice a heavy hatch-beam fell into the No. 4 lower hold. There is testimony that this could have caused the punctures. The respondent refers to "fuel expended" records to show that the fuel expenditure increased after that accident and claims that this tends to prove that the punctures existed before the loading of the steel plates at Baltimore. However, the leak would only affect the amount of "fuel expended" if and when the No. 3 deep tank was filled more than 12 feet, the height of the punctures. It appears that the only time after the hatch-beam fell into the No. 4 lower hold, that the deep tank was filled more than 12 feet was at Panama September 4, 1945, when it was filled to a height of 20 feet. If the leak had existed at that time, a substantial amount of fuel oil would have flowed into the No. 4 lower hold. The engineer's log discloses that the No. 4 lower hold bilge was pumped out at sea September 9, 1945 and there was testimony that it contained traces of oil. However, had the sheathing in the hold been punctured at that time more than mere traces of oil would have been present. This is evident when compared with the log entry as to the substantial amount of oil that flowed out through the punctures at Baltimore between January 18, 1946, the day the tank was filled and January 21, the day the punctures were discovered. Furthermore, the ship was inspected at Baltimore before the stevedores boarded her by a Coast Guard Inspector who did not observe any puncture. Although his inspection certificate is dated January 19, 1946, he testified that he examined the No. 4 lower hold a short time before January 10, 1946, the day the stevedores came aboard. Nor did the Chief Mate who also examined the hold before the stevedores came aboard observe any puncture. The respondent also contends that the "fuel expended" records prove a leak existed before the stevedores went aboard because the amount of fuel expended increased after the hatch-beam fell into the hold. However, the amount of fuel expended was even greater after the Byron Darnton departed from Baltimore and the leak had been repaired than it was before. These records accordingly do not disclose the existence of a leak before the plates were loaded. The Court therefore concludes that the S. S. Byron Darnton was seaworthy in that there was not any puncture in her No. 4 lower hold or in her No. 3 deep tank before she was boarded by the respondent's stevedores on January 10, 1946.

The stevedores finished loading the steel plates into the No. 4 lower hold on Thursday, January 17, 1946. The ship took on fuel oil January 18, 1946. On Monday, January 21, 1946, it was discovered that oil to a height of about 5 feet covered most of the steel plates stowed on the port side of the No. 4 lower hold. The punctures were about 12 feet above the bottom of the hold and 15 to 20 feet to port of the center. The puncture in the sheathing was 12 inches long and a half inch wide at its widest tapering off to a point. It was triangular in shape. Immediately forward of this sheathing in the No. 4 lower hold,

the No. 3 deep tank had an horizontal puncture three by one-half inches.

The main deck hatch was 20 feet athwartships and 35 feet fore and aft. The 'tween deck hatch, leading into the lower hold, was 20 feet athwartships and 30 feet fore and aft. The lower hold was 45 feet fore and aft, 55 feet athwartships, and 28 feet high from the bottom of the hold to the 'tween deck. Immediately forward of the lower hold was the No. 3 deep tank, having an aft bulkhead of steel about one-half inch thick. Between this steel bulkhead and the wooden sheathing in the No. 4 lower hold there was a two inch space filled with insulation, either rock or steel wool. The soft wood sheathing was about 2⅝ inches thick. The distance from the steel bulkhead to the exposed portion of the sheathing was 4⅝ inches. Through the middle of the lower hold there was a propeller shaft alley, 5 feet wide, and 7½ feet high.

The steel plates that were loaded into the No. 4 lower hold varied from ¾ to ⅜ inches in thickness. Ninety-eight plates weighed two tons or more and thirteen weighed between three and seven tons. Sixty-three were over 30 feet and four were between 39 and 40 feet in length. Some had more or less pointed corners.

The steel plates were loaded in the following manner. They were lifted with a clamp on each side, near one end of the plate, from gondola cars and were lowered in a vertical position through the main and 'tween deck hatches into the lower hold. The stevedores in the hold grasped the lower portion of the plate and led it aft, if the plates were to be stowed on the port side of the shaft alley. Thereafter the lower end would be placed on wooden rollers resting on the previously loaded plates and the plate would be lowered further, gradually approaching a more or less horizontal position. While in this position, the plate was at an angle across the shaft alley and, then, while still suspended, it was "kind of twisted" toward the port side so that it could be stowed fore and aft. In performing this operation the plate would come close to the sheathing in the front of the hold due to the length of the plate and occasionally it grazed the sheathing. As the plate was being swung around to get it in a fore and aft position, the higher portion of the plate, particularly the sharp corners, would be pointed directly toward the sheathing. And in loading certain plates, it was necessary to raise them after they had touched the rollers at one end and "jockey" them into a better position.

The libelant contends that during the course of this loading operation the sheathing and the steel bulkhead were punctured through the negligence of the stevedores. No one felt or saw any striking of the sheathing or the steel bulkhead by any plate. The respondent insists that since the steel plates were loaded in a vertical position they could not have caused a horizontal gash. However, it is evident that at various times in the course of the loading, the steel plates had to be in a more or less horizontal position.

The stevedores were in charge of the loading operation in the hold. "It is often a controlling factor in deciding where to throw the burden of producing evidence—and obviously it ought to be—that the proper party to charge is he who alone could discover the truth." Sternberg Dredging Co. v. Moran Towing & Transp. Co., Inc., 2 Cir., 196 F.2d 1002, 1006. But the respondent does not come forward with any adequate explanation of what caused the punctures while its stevedores were loading. See Director General of Railroads v. Peter A. Frasse & Co., 1924 A.M.C. 354. One of the surveyors who examined the damages testified that the punctures were of recent date. It is evident that this damage could not have been caused otherwise than by a heavy object striking with force the sheathing and penetrating the steel bulkhead. So far as the evidence discloses only a heavy steel plate could have caused this damage. See The Jane Anne, 2 Cir., 142 F.2d 197, 1944 A.M.C. 607. The Court therefore con-

cludes that the punctures took place when a steel plate struck and penetrated the sheathing and the bulkhead and that, in the absence of negligence, this accident would not have occurred.

■ Respondent contends that libelant is guilty of contributory negligence because libelant did not direct the loading in a manner to prevent damage. This can not be sustained because by the express terms of the contract respondent was an independent contractor and, libelant accordingly, had "no duty or right of supervision as to instrumentalities adopted and methods used." The Richelieu, 4 Cir., 48 F.2d 497, 502.

■ That libelant did not have an engineer in the hold to detect seepage and that the crew did not take soundings on January 20, 1946, which was a Sunday, does not establish any negligence on part of libelant. See North Atlantic & Gulf S. S. Co. v. New Orleans Stevedoring Co., D.C., 111 F.Supp. 413.

■ The contract expressly provides that the respondent shall be liable for all claims arising through respondent's negligence under $250,000. This is the amount of insurance required under the terms of the contract. The claims demanded in the complaint are under this amount. Therefore respondent's contention that it is not liable for the amounts less than $250,000 can not be sustained.

■ The respondent further contends that the one year limitation of action provided in the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303, applies and bars libelant's claim for the recovery of damage to the cargo. The libelant, as carrier, settled with the shipper of the plates for the damage to them from the oil that flowed through the puncture. But the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., applies only to actions between the carrier and the shipper or owner of the goods. While it is true that in cases in which the stevedore is impleaded he can claim the benefit of the statute, it does not appear that the Government made the settlement of the claim after the statute had run and that it thereby deprived the respondent of a defense which he otherwise might have had. The libelant, under the Carriage of Goods by Sea Act, was under the obligation to the owner of the goods for damage to the goods. The respondent, by its negligence, caused that loss and under the contract which it had with libelant was bound to pay that loss. Since, however, the libelant settled that claim respondent has not had any opportunity to question whether or not the amount thereof was reasonable and it should have such an opportunity before the Commissioner who will assess the damages.

On the facts and for the reasons stated the Court finds that the S. S. Byron Darnton was seaworthy at the time that the plates were loaded, and that the sheathing and bulkhead were punctured through the negligence of the respondent and that the libelant is entitled to a decree for the amount of damage to the ship and cargo and damages incidental thereto to be assessed by a Commissioner to be appointed by the Court. The interlocutory decree is to be settled on notice.