**A. E. STALEY MANUFACTURING COMPANY**

v.

**PORTO RICO LIGHTERAGE COMPANY and the TUG CATANO, her engines, etc.**

Civ. A. No. 67–654.

United States District Court,
E. D. Louisiana,
New Orleans Division.
April 14, 1970.

John W. Hamilton, H. Barton Williams, of Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

James B. Kemp, Jr., Edward J. Brandao, of Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendants.

BOYLE, District Judge:

A. E. Staley Manufacturing Company, as shipper and/or owner of a consignment of soybean oil and charterer of the Barge PONCE on which a cargo of soybean oil was laden, instituted this action against the Tug CATANO, in rem, and her owner, The Puerto Rico Lighterage Company, to recover the value of 16½ percent of the cargo which was lost at sea, and the costs of refining another portion which was contaminated by water.

Only three witnesses testified at the trial, namely, Thomas J. Kenny, an employee of A. E. Saybolt & Company, Inc., an inspector of petroleum, who was present at two of the three discharge points of the PONCE in Puerto Rico in May, 1966; Captain Lowell H. Brentner, who was at the time mate aboard the CATANO; and Captain Arthur H. Terry, an expert in ocean towing. The balance of the testimony, by some thirteen witnesses, crucial to the Court's decision, was admitted by way of depositions, all of which were taken during August, September and October, 1969, over three years after the voyage in question.

While trying cases through the extentive use of depositions makes for brief trials, it deprives the Court of the opportunity personally to observe and, when necessary, interrogate the witnesses. Thus deprived, the Court's task of determining what facts are established by a preponderance of the credible evidence becomes more difficult.

A. E. Staley Manufacturing Company (hereinafter Staley) is a corporation organized and existing under and by virtue of the laws of the State of Illinois with its principal place of business in Decatur, Illinois.

The Puerto Rico Lighterage Company (hereinafter Lighterage) is a foreign corporation organized and existing under and by virtue of the laws of Puerto Rico with its principal place of business in San Juan, Puerto Rico, and is the owner and operator of the M/V CATANO, Official No. 298716, a twin screw, 1520 horsepower (two D-398 caterpillar diesel engines, rated at 760 horsepower each) oceangoing tug of all steel welded construction, having a curved stem model bow, three-level deckhouse, equipped with radio and radar and pilothouse controlled, measuring 89.4 feet in length, with a 28.1 foot beam and with an approximately 9.5 foot draft. On the voyage in question this tug had an eight man crew including the master.

The oceangoing Barges PONCE and SAN JUAN, Official Nos. 289,435 and 289,562, respectively, are identical and are constructed of all steel welded construction with raked bows and stern ends

and measure 195 feet in length, 35 feet in breadth with a depth of 14 feet. Four transverse watertight bulkheads divide the PONCE into two rake compartments and three cargo tank pits with two cylindrical shaped tanks in each cargo tank pit. These tanks are vented (Green #2).

The Barges PONCE and SAN JUAN are owned by Northern Barge Lines, Inc. (hereinafter Northern), who had entered into a towing agreement (Martin #D) with Lighterage, dated January 11, 1966, for a period of one year to tow the PONCE and SAN JUAN in service between the Gulf Coast of the United States and Puerto Rico.

Staley entered into a charter agreement with Northern (Albelo #1), dated April 16, 1966, for one trip to convey soybean oil from the Port of New Orleans to Mayaguez and Ponce, Puerto Rico.[1] There were no contractual relationships between Staley and Lighterage (Martin deposition, p. 6).

On a prior voyage from Puerto Rico to New Orleans in February, 1966, in which the CATANO was towing the SAN JUAN and PONCE, the SAN JUAN took on some water in an *after* compartment. At that time, both barges were taken to Avondale Shipyard in New Orleans where the tanks and dogs were checked and some of the dogs renewed (Brentner #1, LaFontaine deposition, pp. 13, 51). No further difficulties were encountered on the return trip to Puerto Rico.

The cargo of soybean oil was transported from Havana, Illinois to New Orleans aboard the Barge CHEM 51. The soybean oil in compartments #2 and #3 of the CHEM 51 was designated to be loaded on the PONCE. The soybean oil in compartment #2 was of a higher quality because of a preservative which had been added (Thionville deposition, p. 76).

Thionville Surveying Company, Inc. and Thionville Laboratories, Inc. (hereinafter Thionville) were employed by Staley to survey and test the soybean oil loaded from the CHEM 51 into the PONCE through the piping system of American Liberty Tank Terminal (now known as International Tank Terminal) which is located on the West Bank of the Mississippi River in the Port of New Orleans (Thionville deposition, pp. 8, 68; Pettigrew deposition, p. 117).

Staley had inspected and performed tests in Illinois on the soybean oil loaded in compartments #2 and #3 on the CHEM 51. They, therefore, instructed Thionville to visually inspect the soybean oil in those compartments before unloading to determine if there was any impurity, water or cloudiness present rather than perform tests. The inspection proved negative (Thionville deposition, p. 96).

All the tanks of the PONCE were inspected by Thionville for cleanliness[2] and the lines used to load the soybean oil were steam cleaned prior to loading and during the loading to prevent the higher quality soybean oil in compartment #2 of CHEM 51 which was loaded into tank #2 port and starboard of the PONCE from being mixed with the other soybean oil loaded from compartment #3 in the CHEM 51 (Thionville deposition, p. 76).

1. Plaintiff's Request for Admissions dated September 19, 1969, which were ordered admitted for failure of the defendant to answer within ten days under F.R.Civ.P. 36, paragraph 5, establishes the authenticity of the charter party agreement between Staley and Northern for the charter of the Barge PONCE (Albelo No. 1).

2. After arrival in New Orleans from Puerto Rico the Barges PONCE and SAN JUAN were unloaded and steam cleaned (Brentner No. 3) at Avondale Shipyard. They had carried molasses from Puerto Rico.

The following quantities of soybean oil consigned to the parties, with value as indicated below,[3] were loaded into the designated tanks of the PONCE on April 20, 1966, as follows:

| [4] Consignee | Amount loaded lbs. | Price | Value | Tanks |
|---|---|---|---|---|
| Starkist Packing Co. | 653,760 | 13.90 | $ 90,872.64 | #1 Port #3 Starboard |
| Ibec Packing Co. | 240,000 | 13.90 | 33,360.00 | #1 Starboard |
| National Packing Co. | 640,000 | 13.78 | 88,172.00 | #2 Port and Starboard |
| Delmonte, Inc. | 400,000 | 13.70 | 54,800.00 | #3 Starboard |
| | 1,933,760 | | $267,204.64 | |

The tanks of the PONCE were loaded in the following order: #3 port, #1 starboard, #3 starboard, #2 port, #2 starboard and #1 port (Thionville deposition, p. 6). There was sufficient space left in each tank after loading to provide for expansion caused by any agitation, temperature or normal expansion (Thionville deposition, pp. 40, 101; LaFontaine deposition, p. 31; Thionville Nos. 5, 6, 7 and 8).

Thionville's "Certificate of Analysis" indicates eight tests were performed on the soybean oil loaded into tanks #2 port and starboard (which soybean oil contained an added preservative) and seven tests on the soybean oil in the remaining tanks. The eighth test, performed only on tanks #2 port and starboard, was a "moisture and volatile" test. All the tests indicated that the oil met required standards (Thionville Nos. 5, 6, 7 and 8). Although members of the crew of the tug were present during loading and discharge, none of them helped load or unload the PONCE (Crespo deposition, p. 4; Salas deposition, p. 4; Deal deposition, p. 8).

After completion of the loading, the hatches were closed by the terminal. Several crew members of the CATANO under the supervision of the mate, Brentner, checked and tightened the hatches.[5] Thionville representatives then sealed (Thionville #1) each hatch cover (Pettigrew deposition, pp. 113, 118). Thereafter, George Green, Jr., a marine surveyor for the United States Salvage Association, Inc., together with Mr. Carl Schaefer, who represented Northern, Captain LaFontaine and the mate, Brentner, both of the CATANO, made an inspection tour of the barges and the tug and discussed the method of tow (Green deposition, pp. 13, 14). Captain LaFontaine and George Green, Jr. inspected each hatch cover to make certain it was secure (Green deposition, p. 16; LaFontaine deposition, p. 31). George Green, Jr. approved the barges, the tug and the

3. This value is based on the price of soybean oil the day it is invoiced. Therefore, the prices indicated are those which prevailed on the day the consignees were invoiced and since they were billed on different dates the prices are different (Rentshler deposition pp. 6 to 8; Albelo Nos. 3, 8, 12 and 15).

4. Plaintiff's Request for Admission referred to in Footnote 1, paragraphs 1, 1a, 1b, 2, 2a, 2b, 3, 3a, 3b, 4, 4a and 4b, establishes the amount of fully refined soybean oil loaded into the Barge PONCE in New Orleans, and the authenticity of the bills of lading (Albelo Nos. 2, 7, 10, 13) and original invoices (Albelo Nos. 4, 9, 11, 15) issued to the various consignees of the soybean oil.

5. Emile Salas, an ordinary seaman on the CATANO, testified by deposition that he recalled that some of the dogs on the hatch covers were bad, although he could not remember which hatch cover on which barge (deposition p. 10).

method of tow (Brentner #15) for the voyage from New Orleans to Puerto Rico (Green #1). He also approved the draft of the PONCE which was recorded by the mate in the logs of the CATANO as being: fwd port 5' 05", aft port 8' 03", fwd starboard 5' 10" and aft starboard 8' 05" (Brentner #3).

Prior to departure of the tug and its tow, Green checked with the U. S. Weather Bureau, which advised that normal weather conditions prevailed. At 1945 hours on April 20, 1966, the tow began the voyage down the Mississippi River towards the Gulf of Mexico with a commercial pilot aboard. Upon arrival at Pilottown, Captain LaFontaine contacted Green and was advised that the weather prediction was favorable and that the tow could proceed (Green deposition pp. 18, 19).

The barges were put astern as the tug approached the River's Southwest Pass. As the tow entered the Gulf of Mexico the barges were in tandem formation with the Barge SAN JUAN 1200 feet behind the CATANO and the PONCE 800 feet behind the Barge SAN JUAN (LaFontaine deposition, p. 20; Brentner #5).

On the voyage the CATANO encountered rough, moderate rough, heavy swell, high swell, moderate and moderate high seas. At various times, depending upon the condition of the sea, the engine RPM's varied from 800 to 1200 RPM's, the latter being full speed ahead for the CATANO.[6] Usually between the mouth

6. The logs of the Tug CATANO reflect as follows (Brentner 3):

| Period | Time | Wind | Sea | RPM | Remarks |
|---|---|---|---|---|---|
| Apr. 21 | 1130 | | | | Departed sea buoy 1130 hrs. |
| | 1200 | N–5–6 | Rough | 1200 | |
| | 1600 | E NE–4 | Rough | 1200 | |
| | 2000 | E–4 | Moderate high | 1200 | Barges checked, running lights OK. |
| | 2400 | E–3 | Moderate high | 1200 | Tows checked frequently and found OK. |
| Apr. 22 | 0800 | SE–5 | Rough | 1100 | Speed reduced to ease strain on tow gear. |
| | 1200 | E–7 | Rough | 1000 | Sea increasing tug & tows' pitching & rolling, reduce speed to 1000 RPM. |
| | 2000 | E–5–6 | Rough | 900 | Tow gear checked frequently. |
| | 2400 | SE–5–6 | Rough | 900 | |
| Apr. 23 | 0800 | SE–5–6 | Heavy swell | 900 | |
| | 0900 | —— | —— | 850 | Reduce speed to 850 RPM. |
| | 1200 | E SE–5–6 | Rough | 850 | Tug & tows pitching & rolling easily at reduced RPM. |
| | 1600 | E SE–4–5 | Rough | 850 | Barges watched closely, riding OK. |
| | 2000 | SE 5–6 | High swell | 800 | Tows & gear checked frequently, all OK. |
| | 2400 | SE–5–6 | High swell | 800 | Barges riding easily to rough head seas. |
| Apr. 24 | 0800 | E SE–5 | High swell | 850 | |
| | 1000 | —— | —— | —— | 1000 increase to 900 RPM. |
| | 1100 | —— | —— | —— | 1100 increase to 1000 RPM. |
| | 1200 | SE–5 | Moderate high | 1000 | Barges watched closely, riding OK. |
| | 1600 | SE–5 | Moderate high | 1000 | Tows & gear checked frequently. |
| | 2000 | E SE–5 | Moderate high | 1000 | Barges checked & found OK. |
| | 2400 | E SE–5 | Moderate high | 1100 | Barges & towing gear checked, all OK. |

| Period | Time | Wind | Sea | RPM | Remarks |
|---|---|---|---|---|---|
| Apr. 25 | 0500 | —— | —— | —— | 0500 full ahead both engines, tows watched closely. |
| | 0600 | E SE–4 | Moderate | 1200 | |
| | 1200 | SE–3 | Moderate | 1200 | |
| | 1300 | —— | —— | —— | 1215 stop stbd. engine while working on steering. 1238 full ahead both engines. |
| | 1600 | E–4 | Moderate | 1200 | 1647 Dry Tortugas L/H abeam 8 mi. off. |
| | 2000 | E SE–3 | Moderate | 1200 | Tows checked frequently, riding OK. |
| | 2400 | E SE–3 | Moderate | 1200 | Advance clocks one hour. |
| Apr. 26 | 1200 | E SE–4 | Moderate | 1200 | |
| | 1600 | E–5 | Moderate rough | 1200 | |
| | 1900 | —— | —— | —— | 1900 slow both engines to 1050 RPM, rough seas. |
| | 2000 | E–5 | High swell | 1050 | Proceed at reduced speed, barges checked. |
| | 2400 | E–5 | Rough | 1050 | Tows watched closely, OK at reduced speed. |
| Apr. 27 | 0300 | —— | —— | —— | 0300 increase speed to 1100 RPM. |
| | 0500 | —— | —— | —— | 0510 full ahead both engines. |
| | 1200 | Ex S–4 | Moderate | 1200 | |
| | 1300 | —— | —— | —— | 1330 slow to 1100 RPM. |
| | 2000 | SE–5 | Heavy swell | 1100 | Proceeding at reduced speed, heavy swell. |
| | 2200 | —— | —— | —— | 2200 sea moderate & wind diminishing, resume normal speed of 1200 RPM. |
| Apr. 28 | 0500 | —— | —— | —— | 0532 Cayo Paredon Grande at 6 mi. course 115°. |
| | 1200 | E–4 | Moderate | 1200 | |
| | 1300 | —— | —— | —— | 1345 Cay Lobos abeam 3.0 mi. off. |
| | 1600 | E–5 | Rough | 1200 | |
| Apr. 29 | 0200 | —— | —— | —— | 0200 Reduce speed to 1100 RPM due to increasingly heavy head sea. |
| | 0800 | E–5 | Rough | 1050 | |
| | 1200 | E–5 | Rough | 1050 | Proceeding at reduced speed in heavy sea. |
| | 2000 | E–5–6 | Heavy seas | 1050 | Barges & tow gear checked. |
| | 2400 | E–7 | Heavy seas | 1050 | Tows checked, riding OK. |
| Apr. 30 | 0800 | E–6 | High swell | 1050 | Barges apparently riding well. |
| | 1200 | E–6 | Rough | 1050 | Proceed at reduced speed. |
| | 1600 | E NE–6 | Rough | 1050 | |
| | 1800 | —— | —— | —— | Increase speed to 1100 RPM. |
| | 2000 | E NE–6 | Heavy sea | 1100 | |
| | 2400 | E NE–5 | Heavy sea | 1100 | Barges checked, riding OK. |
| May 1 | 0500 | —— | —— | —— | 0515 full ahead both engines. |
| | 1200 | E–5 | Rough | 1200 | |
| | 1500 | —— | —— | —— | 1510 reduce speed to 1100 RPM, sea increasing. |
| | 1600 | E–6 | Heavy sea | 1100 | |
| May 2 | 0800 | E–5 | Heavy swell | 1050 | |
| | 1200 | E–5 | Rough | 1150 | |
| | 1600 | E–5 | Rough | 1150 | |
| | 2000 | E–4 | Moderate | 1200 | |

of the Mississippi River and Puerto Rico the seas run three to four feet and occasionally rougher, or five, six or seven feet (LaFontaine deposition, pp. 36, 37).

The barges were observed frequently by the mate and captain from the pilothouse, both with and without binoculars, during the day and at night by using a spotlight (LaFontaine deposition, pp. 34, 40, 41; Deal deposition, p. 13). They particularly watched for a pronounced list, change in draft or other distress signal from the barges (LaFontaine deposition, p. 13). Nothing unusual was observed by either the mate or the captain or any member of the crew and in particular they did not notice that some of the hatch covers on the PONCE were off or that the PONCE's draft had changed (LaFontaine deposition, pp. 34, 42; Brentner trial testimony). Since the barges did not appear to be in distress or in any danger throughout the voyage the tow was not stopped, nor did the tug come about to examine the barges.

During the voyage the captain and the mate made the log entries on scratch paper from which the mate would usually make the entries into the log at the end of each watch. The mate would then sign the log; however, if the captain made the entries he would sign the log. The scratch papers were then thrown overboard. This same procedure was followed by the engineer and assistant engineer in keeping the engine log (Deal deposition, p. 9; Crespo deposition, p. 5). This was the usual procedure followed aboard the CATANO.

On May 4, 1966, upon arrival in Mayaguez, Puerto Rico, the barges were brought alongside the tug and for the first time the captain noticed that the hatch covers on tanks #2 and #3 starboard and #3 port on the PONCE had been torn off (Salas deposition, p. 9; Crocco #1; Brentner #3) and were lying around the deck (LaFontaine deposition, p. 45; Ramos deposition, p. 7) along with some spilled cargo. It was also noted that the PONCE had lost approximately 2½ feet of draft at her stern and was on an even keel [7] (LaFontaine deposition, p. 49; Brentner #3).

Captain LaFontaine appeared before a notary public in Puerto Rico on May 6, 1966 and entered a Marine Note of Protest in which he stated that during the voyage boisterous winds and weather were encountered to such an extent that it was necessary to reduce speed to prevent damage to the tug, barges and cargo, and that fearing damage from weather conditions the note of protest was so entered (Martin #5).

Three surveyors attended the discharge of the PONCE at the ports of Mayaguez, Ponce and Catano, Puerto Rico (Colon #5, Crocco #1). Francis McGahan (now deceased) of Francis B. Crocco, Inc. at-

| Period | Time | Wind | Sea | RPM | Remarks |
|---|---|---|---|---|---|
| May 3 | 0800 | E–3 | Moderate high | 1200 | |
| | 1200 | E–3–4 | Moderate | 1200 | |
| | 1600 | E–4 | Moderate high | 1200 | |
| May 4 | 1200 | E NE–4 | Moderate high | 1200 | |
| | 1448 | —— | —— | —— | Arrival at entrance buoy No. 3, Mayaguez, P. R., speed from Desecheo 6.3 kts, calm sea from noon to arrival. |

7. The draft had changed to: fwd port 5' 10", aft port 5' 10", fwd starboard 6' 00", aft starboard 5' 10" from a draft of fwd port 5' 05", aft port 8' 03", fwd starboard 5' 10", aft starboard 8' 05", respectively, (Brentner No. 3).

tended for Staley. This survey was routine and would have been done even if the voyage had been uneventful. McGahan checked for quantity only (Crocco deposition, p. 4). Hippolito Colon Valasquez of Benaco Adjusters, Inc. attended for Staley's underwriters, Centennial Insurance Company (hereinafter Centennial). He checked for both quantity and quality (Valasquez deposition, p. 43). Mr. Thomas Kenny of A. W. Saybolt & Company attended for the consignees and he checked for quantity only (Schroeder deposition, p. 29).

The soybean oil consigned to Ibec in tank #1 starboard on the PONCE was slightly contaminated by water although the hatch cover had not been torn off. Del Monte's shipment in #3 port on the PONCE was likewise found to be slightly contaminated by water, but its hatch cover had been torn off. The soybean oil in tanks #2 and #3 starboard, which tanks had lost their hatch covers, was not tested for quality by Staley. Though not tested by Staley, it was tested by the consignees and was found acceptable (Crocco #1).

The surveyor Hippolito Colon Valasquez of Benaco Adjusters, Inc., representing Staley's underwriters, Centennial, checked the quality of the cargo in and sent samples thereof from tanks #1 starboard and #3 port to Laboratoria Quimico Clinico in Puerto Rico for an analysis. Their report (Colon #6) reflects that the soybean oil showed a slight opacity due to water which disappeared upon warming. The report further concluded that the water did not contain appreciable quantities of sodium chloride (salt) that could be attributed to a mixture of soybean oil with salt water.

The contaminated soybean oil which was consigned to Ibec and Del Monte was unloaded at Empacadora Del Caribe, Inc. in Catano, Puerto Rico, where it was refined and shipped by truck to Ibec and Del Monte in Mayaguez at a total cost, including laboratory fees of $7,071.01 (Albelo Nos. 16, 17, 18; Colon 2, 3A–N).

In Puerto Rico the following quantities of soybean oil were delivered and the consignees paid to Staley the prices indicated:

| Consignee | Amount delivered in lbs. | Price | Value |
|---|---|---|---|
| Starkist Packing Co. | 505,368.34 | 13.90 | $ 70,246.20 |
| Ibec Packing Co. | 239,240.00 | 13.90 | 33,254.36 |
| National Packing Co. | 623,077.49 | 13.78 | 85,860.07 |
| Delmonte, Inc. | 229,060.00 | 13.70 | 31,381.22 |
| | 1,596,745.83 | | $220,741.85 |

Of the original 1,933.760 lbs. of soybean oil shipped to Puerto Rico aboard the PONCE, the various consignees received 1,596,745.83 lbs. for a shortage of 337,014.17 lbs., which was valued at $46,462.79.[8]

8. a. Plaintiff's Request for Admissions referred to in Footnotes 1 and 4, paragraphs 1c, 2c, 3c and 4c, further establishes the amount of soybean oil unloaded from the Barge PONCE in Puerto Rico and authenticity of the revised invoices (Albelo Nos. 3, 8, 12, 14) issued to the various consignees.

b. Paragraph 6 of plaintiff's Request for Admissions reflects that Centennial, Staley's underwriter, loaned it the sum of $56,860.42 to cover the loss of and damage to the cargo of soybean oil carried aboard the PONCE from New Orleans to Puerto Rico in April and May, 1966 (Robertson Nos. 1, 2). However, the evidence establishes $46,482.79 as the value of the lost cargo, and $7,076.01 as the cost of refining the contaminated cargo. In addition, the plaintiff claims $714.34 for various expenses which is not supported by any evidence. These amounts total $54,273.14. The deposition of William Robertson reflects, at page 8, that Staley originally calculated the loss to be $54,261.29 (vs. the $54,273.14 loss alleged by

■ In addition to the value of the lost cargo and the cost of refining the contaminated cargo the plaintiff is seeking to recover $714.34 for laboratory fees, survey fees and telephone and telex charges. Although several invoices have been filed in the record, one from Benaco Adjusters for $1,286.50 billed to Centennial (Colon #4) and another from Francis B. Crocco, Inc. to Staley for $421.59 (which survey would have been performed whether there was a loss of cargo or not as previously noted) (Crocco #2), we are unable to find any evidence which establishes this alleged $714.34 expense.

This Court has jurisdiction and venue is properly laid in the Eastern District of Louisiana.

■ The law with respect to a contract of towage is well settled. The established principles are:

(a) The tug is not liable as an insurer or as a common carrier, but owes to the tow the duty to exercise such reasonable skill as prudent navigators employ in the performance of similar services.

(b) A contract of towage does not create a bailor-bailee relationship.

(c) An action by the tow against the tug is ex delicto, not ex contractu.

(d) Negligence must be affirmatively shown and the burden of proving negligence rests upon those seeking to establish liability therefor.

(e) No presumption of negligence arises merely on proof that the tow was in good condition when delivered and in damaged condition upon arrival.[9]

Plaintiff contends that all the evidence concerning the voyage is in the control of the defendant and therefore "the burden of producing evidence of what occurred and of demonstrating the loss was without fault of the CATANO is on the defendant."[10]

■ A careful review of the authorities cited and others not cited [11] by the plaintiff establishes primarily that

the plaintiff in his trial memoranda) and that the broker revised the figures based on what was actually determined to be lost and submitted the revised figure of $56,860.42 which was accepted by Staley. As far as we can ascertain, the figure of $56,860.42 submitted by Centennial to Staley was based on the amounts of soybean oil received by the consignees as reflected by the survey (Schroeder Nos. 1 through 3c) conducted by Thomas Kenny of A. W. Saybolt & Co., Inc. Kenney's survey reflects that the consignees received a smaller quantity of soybean oil than the amounts for which they paid. (See Footnote 1.)

9. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); Stall & McDermott v. The Southern Cross, 196 F.2d 309 (5th Cir. 1952); New Orleans Coal, etc. v. United States, 86 F.2d 53 (5th Cir. 1936); South, Inc. v. Moran Towing & Transportation Co., 252 F. Supp. 500 (S.D.N.Y.1965), affirmed by the Second Circuit, 360 F.2d 1002 (1966); Sentell v. Gibson Bros. Towing Co., 173 F.Supp. 737 (S.D.Ala.1959); Caribbean Towing Co. v. SS John W. Cullen, 297 F.Supp. 778 (E.D.La.1968); Chitty v. M/V Valley Voyager, 284 F. Supp. 297 (E.D.La.1968); Hart v. Blakemore, 410 F.2d 218 (5th Cir. 1969); American Bridge Div., U. S. Steel Corp. v. Roen Steamship Co., 328 F.2d 838 (7th Cir. 1964); Offshore Company v. G. & H. Offshore Towing Co., 262 F.Supp. 282 (S.D.Tex.1966).

10. Plaintiff cites as authority Selma Rome & Dalton RR Co. v. United States, 139 U. S. 560, 11 S.Ct. 638, 35 L.Ed. 266 (1891); Commercial Molasses Corp. v. New York Tank Barge Co., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941); Sternberg Dredging Co. v. Moran Towing and Transportation Co., Inc., 196 F.2d 1002 (2nd Cir. 1952); Cliett v. Scott, 102 F.2d 725 (5th Cir. 1939).

11. Fleming v. Harrison, 162 F.2d 789 (8th Cir. 1947); Tendler v. Jaffe, 92 U.S. App.D.C. 2, 203 F.2d 14 (1952); Sam Macri & Son, Inc. v. United States of America, 313 F.2d 119 (9th Cir. 1963); Brown v. Mars, 135 F.2d 843 (2nd Cir. 1943); Miller v. Lykes Bros-Ripley SS Co., 98 F.2d 185 (5th Cir. 1938); GEJ Corporation v. Uranium Aire, Inc., 311 F.2d 749 (9th Cir. 1962); Erving Paper Mills v. Hudson-Sharp Machine Co., 332 F.2d 674 (7th Cir. 1964); United States v. Bull Steamship Lines, 146 F.Supp. 210 (S.D.N.Y.1956), 31 C.J.S. Evidence §§ 104, 110, 112 and 113.

the burden of proof does not shift.[12] However, the law takes into account the relative opportunities of the parties to know the facts at issue, and when those facts are within the knowledge or control of a party, the burden of producing that evidence rests on it. Thus, if the tug which is in possession of all the facts surrounding the voyage fails to come forward with the information, the Court is free to draw an inference of fact unfavorable to the tug upon the plaintiff's establishing that there was a loss of cargo during the voyage.

■ To avoid this unfavorable inference, namely, the breach of the duty to exercise such reasonable skill as prudent navigators employ for the performance of similar service, the tug interests must go forward with evidence sufficient to persuade that the non-existence of the breach of duty, which would otherwise be inferred, is as probable as its existence. If the tug does come forward with sufficient evidence to raise doubt as to the validity of the inference, the plaintiff has not sustained the burden of persuasion which upon the whole evidence remains upon him where it rested at the start.[13]

The tug here has offered evidence to show that the crew kept the tow under observation throughout the entire voyage, that it did not notice a change in the trim of the PONCE and it has offered its logs reflecting weather conditions and its speed throughout the voyage. If this case is one for application of the rule aforesaid, the tower has come forward with evidence to establish that its crew exercised reasonable care and skill as prudent navigators employ for the performance of a similar service, leaving, in our judgment, the burden of persuasion still resting on the plaintiff.

■ But we are not convinced that the above rule of law should be applied here. First, the cargo has had the benefit of and has employed [14] the modern discovery methods established by the Federal Rules of Civil Procedure.[15] Secondly, the cases [16] in this area reviewed by us reflect that in each and every case the party seeking the aid of this rule of law was unable to obtain the information which was in the control and knowledge of the other party. It has not been suggested to us that there is any other evidence in the control and knowledge of the tug which it has failed to produce or which the plaintiff has failed to discover.

■ The plaintiff contends that the tower took the precaution of destroying the sheets of paper on which the mate and captain kept notes which were daily transferred to the log book, and that since these sheets of paper were not produced, an inference arises that the notes if produced would have been favorable to plaintiff's case. The authorities cited by plaintiff discuss the failure of a vessel to produce its *official* logs rather than notes written which were subsequently entered in the official log. In this case the evidence shows that this procedure was followed on every voyage, not only by the captain and mate, but also by the engineer in the keeping of the engine log. The mate, Captain Lowell Brentner, who has 26 years experience at sea, testified at the trial that this was the custom on all the tugs he had served on. Plaintiff offered no evidence suggesting any ulterior motive for discarding the notes. Both the mate and captain testified that the entries in the log were made correctly from the discarded notes and correctly reflected the events described.

12. Commercial Molasses Corp. v. New York Tank Barge Co., supra.

13. Commercial Molasses Corp. v. New York Tank Barge Co., supra; Diesel Tanker F.A. Verdon, Inc. v. Stakeboat No. 2, 340 F.2d 465 (2nd Cir. 1965); United States v. Denver & R.G.R. Co., 191 U.S. 84, 24 S.Ct. 33, 48 L.Ed. 106 (1903).

14. Interrogatories propounded by Staley on February 24, 1969. Thirteen discovery depositions were taken and have been offered and received in evidence.

15. Tortora v. General Motors Corp., 373 Mich. 563, 130 N.W.2d 21 (1964).

16. See Footnotes 10 and 11.

■ As to the plaintiff's contention that the only witnesses were defendant's employees, we are of the opinion that the language in Stevens v. The White City, supra, quoted below, is apposite here.

"* * * Neither is it material that the facts of the case, and the causes of the collision, are peculiarly within the knowledge of the respondents. It is alleged in the present case, as one of the inconveniences of the libelant's situation, that it would be compelled, in order to establish the allegations of the libel, to resort to the testimony of those navigating the respective tugs, and thus call witnesses interested to exonerate the vessel to which they were attached. We are not aware, however, of any ground on which such an inconvenience can affect the rule of law which governs the rights of the parties. * * *"

See also South, Inc. v. Moran Towing and Transportation Co., 360 F.2d 1002 (2nd Cir. 1966).

■ The plaintiff contends that the PONCE was damaged, resulting in a partial loss and contamination of its cargo by the negligence of the Tug CA-TANO and its officers in that (a) the tug proceeded at an excessive speed under the circumstances, (b) the crew of the CATANO failed to keep its tow under observation, (c) the crew failed to notice a substantial change in the PONCE's trim and (d) the crew failed to go back and inspect the PONCE after going through heavy weather.

As to the plaintiff's first contention, the evidence fails to establish that the CATANO was proceeding at an excessive speed. There is no evidence in the record that the speed registered in the log of the CATANO, considered with re-gard to the makeup of the tow and the surrounding weather conditions, was excessive. Indeed, the only expert on towing, produced by the tug, testified that the speed was reasonable; otherwise, there is no other evidence in the record as to what a proper rate of speed would be.[17]

■ A tug is obligated to keep her tow under observation.[18] Both Captain LaFontaine and the mate, Brentner, who stood alternate watches in the wheelhouse, testified that they observed the tow frequently, with the use of binoculars and at night a spotlight was also used. They testified that they watched for a change in draft or other signals of distress. Additionally, the tug's logs reflect that the tow was checked at various times. In absence of evidence to the contrary, we have no alternative other than to find that the tug kept reasonably close observation of her tow.[19]

If the captain and the mate of the CATANO did keep their tow under surveillance, should they not have noticed the missing hatch covers or change in the Barge PONCE's trim? The evidence discloses that the weather was moderate to rough and the crew testified that the weather on this particular trip was bad or boisterous. The bow of the Barge PONCE was approximately three eighths of a mile (2000') and its stern about four tenths of a mile (2195') behind the CA-TANO. Both the captain and the mate testified that they did not notice the hatch covers had been torn off. They testified that they could not see the hatch covers themselves except when in an open upright position. When closed (and, of course, when lodged between the tanks after being torn off) the covers could not be seen from the tug.

The Barge PONCE was approximately three feet lower at the stern when it de-

---

17. Valentine Waterways Corporation v. Tug Choptank, 260 F.Supp. 210 (E.D. Virginia 1966); South, Inc. v. Moran Towing & Transportation Co., 360 F.2d 1002 (2nd Cir. 1966); Atlantic Gulf & Pacific Co. v. The Barney Turecamo, 202 F.Supp. 31 (S.D.N.Y.1962).

18. The Mariner, 52 F.Supp. 739 (D.C. Mass.1943).

19. A. S. Wikstrom, Inc. v. The Julia C. Moran, 190 F.Supp. 250 (S.D.N.Y.1960); Hart v. Blakemore, supra.

parted New Orleans and on an even keel when it arrived in Puerto Rico. The captain and mate testified that when viewing the barge headon under the circumstances it would be difficult to notice a change in the PONCE's trim. The defendant's expert, Arthur H. Terry, testified that the PONCE's change in trim might not be noticeable in rough waters. No evidence or expert testimony was introduced by the plaintiff to show that it was possible to notice the PONCE's missing hatch covers or change in trim. Furthermore, it was never established when or approximately when the PONCE was damaged and lost its cargo. It could have happened during the day or at night, on the first day at sea or the last day. We find that it is quite possible that both the master and the mate, although keeping a proper watch over the tow, could not and did not see the PONCE's torn off hatch covers or change in trim, and, therefore, we find that the plaintiff has failed to sustain its burden.

The plaintiff's last contention of negligence, failure to go back and physically inspect the Barge PONCE during the voyage, is likewise not supported by any evidence or expert testimony. The captain of the CATANO testified that the barges never appeared to be in any danger or distress and, therefore, he did not change course, stop, or order any members of his crew to board and inspect the barges. Since it has not been established that the master or the mate did notice anything unusual about the barges during the voyage, we cannot find them negligent for failure to take action to correct a situation of which it has not been proven they were aware or of which, in the exercise of reasonable care and maritime skill employed by prudent navigators in the performance of similar service, they should have been aware.

There is authority, not cited or relied upon by the plaintiff, for the proposition that circumstances may create a strong presumption of negligence which would require the tug to show a reasonable excuse for the accident.[20]

The following quotation from Bisso v. Waterways Trans. Co., supra, explains the rule as follows:

"This brought into play the sensible rule that, even though the engagement is in contract so that the duty of the tug toward the tow is that of due care only, with the consequent burden on the tow of establishing negligence [citing cases], a stranding which occurs under circumstances which ordinarily results in no such casualty puts on the tug the obligation of some satisfactory explanation. 'When an accident occurs to the tow the action is ex delicto and the burden is on the tow to show negligence on the part of the tug. However, circumstances may create a strong presumption of negligence. In that event the burden is on the tug to rebut the prima facie case or, at least, to show a reasonable excuse for the accident other than its own negligence. * * *'"

After reviewing the cases we are in full accord with the statement made by Chief Judge Connolly in Offshore Company v. G. & H. Offshore Towing Co., supra, 262 F.Supp. at page 286, in which he concluded, "I am not sure that the cases may all be reconciled, for while all those cited by libellant pay lip service to Stevens v. The White City, in a number of instances the courts base the finding of the tug's negligence on what seems to be rather nebulous and uncertain grounds. * * *"

The tug has offered evidence showing that before departing the master and mate, with Green, a surveyor representing Staley, and Schaefer, representing

20. Sternberg Dredging Co. v. Moran Towing & Transportation Co., supra; Detyens Shipyards, Inc. v. Marine Ind. Inc., 349 F.2d 357 (4th Cir. 1965); Bisso v. Waterways Trans. Co., 235 F.2d 741 (5th Cir. 1956); The Anaconda, 164 F.2d 224 (4th Cir. 1947); Simkins v. R. L. Morrison & Sons, 107 F.2d 121 (5th Cir. 1939); Geo. W. Rogers Construction Corporation v. Tug Ocean King, 252 F. Supp. 657 (S.D. New York 1965).

Northern, inspected the barges after the hatches were closed by the terminal, were checked and tightened by the tug's crew under the mate's supervision, and were sealed by Staley's representative; that the tow appeared seaworthy; that the method of tow was discussed by the master and mate with Green and Schaefer who approved it (the method of tow has been conceded by Staley to be proper); that the tug proceeded at reasonable speed and kept the tow under observation throughout the voyage. In short, it has offered evidence to establish that "it exercised such reasonable care and maritime skill as prudent navigators employ for the performances of similar services." When it is borne in mind that the barge was riding between 2000 and 2195 feet astern of the tug, that the weather was bad and the seas were moderate to rough, that the damage and loss of cargo could have happened at any time, day or night, it is very possible that the hatch covers, loss of cargo and contamination might occur without knowledge of the tug's crew, (especially since, as previously noted, the hatch covers could only be seen if in an open upright position), though they be in the exercise of due care. If a presumption of negligence did arise under the authority cited, (although we are not convinced that plaintiff is entitled to such presumption), we find that the tug has offered evidence rebutting that presumption and the burden of producing evidence to prove the tug was negligent remains with the plaintiff.

 Although George Green, Jr., the surveyor from the U. S. Salvage Association, and Captain LaFontaine testified that they inspected the hatch covers in New Orleans before the tow proceeded, it is possible that the covers were unseaworthy. In this regard the towing vessel is not liable for the loss occasioned by the unseaworthiness of the tow unless its unseaworthiness is disclosed, or is so apparent that it would constitute negligence for the tug to proceed.[21] In this case if the PONCE was unseaworthy it was not disclosed or apparent at the commencement of the voyage.

We are not called upon to determine the cause of the damage and loss; we are called upon to decide if the tower was negligent. However, we would comment that this case as presented leaves many questions unanswered. The evidence presented on certain issues is so conflicting and vague that we find ourselves unable to decide exactly what occurred. For example, Arthur H. Terry, the only expert on towing to testify, stated that the lead barge, the SAN JUAN in this case, would be subject to more pounding, yet the SAN JUAN and its cargo were not damaged. Also, all the evidence establishes the hatch cover on tank #1 starboard was not broken or open and yet its cargo was contaminated by water with little or no salt content.

It is possible that the tug was guilty of negligent towing; however, it is also possible that the PONCE was unseaworthy, although this unseaworthiness was not apparent to or discovered by the master, mate or the surveyor, George Green, Jr., representing Staley, who inspected the barges prior to their departure. Whatever the case may be, in our opinion, the plaintiff has failed to sustain its burden, that is, it has failed to prove by a preponderance of the evidence that under the facts of this case the crew of the CATANO failed to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.

The above shall constitute the Court's findings of fact and conclusions of law.

Accordingly, judgment shall be entered dismissing the complaint with costs.

21.´ Otto Candies, Inc. v. Great American Insurance Company, 221 F.Supp. 1014 (E.D.La.1963), affd. 332 F.2d 372 (5th Cir. 1964).