AIPLE TOWING COMPANY, INC.,
Certain Underwriters at Lloyd's,
London, Plaintiffs,

v.

The M/V LYNNE E. QUINN, her
engines, tackle, apparel, etc., in rem
and Cliff, Jr., Inc., Defendants.

Civ. A. No. 80–1137.

United States District Court,
E. D. Louisiana.

March 2, 1982.

Thomas J. Grace, New Orleans, La., for plaintiffs.

Ralph E. Smith, New Orleans, La., for defendants.

CASSIBRY, District Judge:

Plaintiff Aiple Towing Company, Inc., as the owner of the Barge IBL–33, and its insurer, Certain Underwriters at Lloyd's, London, seek damages from defendants, the M/V LYNNE E. QUINN and its owner and operator, Cliff, Jr., Inc., for damages which resulted from the sinking of the barge while in tow under the custody and control of the defendants. The trial in this matter was held before the court without a jury on November 23 and 24, 1981. After considering the pleadings, the testimony of the wit-

nesses, the documents in evidence, and the law applicable to this case, the court now enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The plaintiff, Aiple Towing Company, Inc. (Aiple) was and is now a corporation organized and existing under the laws of a state other than the state of Louisiana. It was at all pertinent times the owner of the Barge IBL–33. Certain Underwriters at Lloyd's, London, are foreign insurance companies which had issued a policy of insurance to Aiple insuring the casualty which forms the basis of this lawsuit.

2. The defendant, Cliff, Jr., Inc., was and is now a Louisiana corporation with its principal place of business in Harvey, Louisiana. It was at all pertinent times the owner and operator of the M/V LYNNE E. QUINN.

3. The IBL–33 is an all-welded steel constructed covered hopper barge built at Brownville, Pennsylvania in 1955. The barge is fitted with 11 lift-type cargo covers and 10 manhole covers. Its dimensions are 195.2 feet by 35.1 feet by 11.0 feet. A barge of such dimensions and specifications is not a seagoing barge, and not designed for movement through the open waters of the Mississippi Sound.

4. On January 23, 1979, the IBL–33 was loaded with a cargo of 49,141 bushels of corn in Hickman, Kentucky, for the account of Louis Dreyfus Corporation. The barge was towed to New Orleans. Dreyfus then determined that the barge's final destination should be Pascagoula, Mississippi, and arranged for the defendant to tow the barge from New Orleans to Pascagoula.

5. On the afternoon of February 15, 1979, Mr. Jay Schmitt, Aiple's representative in the New Orleans area, personally inspected the IBL–33 at the Riverway Fleet in order to assure its seaworthiness for the voyage to Pascagoula. Mr. Schmitt inspected the wing tanks on the barge, and he replaced the twist-lock manhole covers, making certain that each was locked into place. On the same day, the barge was inspected by a repair company; all compartments were pumped dry and a small fracture was temporarily repaired.

6. The barge was taken in tow by the M/V LYNNE E. QUINN at the Bulk Plant in New Orleans on February 23, 1979, at 1:00 a. m. The IBL–33 was positioned as the lead barge in the port string in a tow of 9 barges, made up 3 wide and 3 deep. The IBL–33 at that time had approximately 2 feet to 3 feet freeboard. The crew of the M/V LYNNE E. QUINN made no inspection of the barge when taking it in tow, although they knew that rough seas were predicted.

7. The M/V LYNNE E. QUINN and tow, including the IBL–33, were fog-bound at the Bulk Plant until noon on February 23, 1979, when the voyage to Pascagoula commenced. At midnight, the M/V LYNNE E. QUINN and tow stopped at the sheltered waters of the Rigolets due to heavy fog.

8. The New Orleans Area Weather Service forecast at 9:39 p. m. on February 23, 1979, predicted winds near 15 knots shifting to the northwest, with seas 4 to 6 feet, higher seas and winds near thunderstorms throughout the night. Despite these forecasts, the M/V LYNNE E. QUINN and its tow left the Rigolets at 8:00 a. m. on February 24, 1979, and headed toward the open waters of the Mississippi Sound.

By 9:39 a. m., the Weather Service forecast for the pertinent area from Biloxi to Morgan City, out 50 miles, predicted southeast winds 15 to 20 knots, shifting to northwest during the night, with seas 4 to 6 feet, winds and seas briefly higher near scattered thunderstorms. The M/V LYNNE E. QUINN continued into open waters, although it could safely have returned to sheltered waters.

By 3:39 p. m., there was a small craft advisory in effect, with predictions of shifting winds becoming north to northwest at 20 to 30 knots at night, seas 5 to 8 feet, and thunderstorms with the wind shift.

9. The captain of the M/V LYNNE E. QUINN, George Pullman, did not monitor

the weather forecasts between 8:00 a. m. and 4:30 or 5:00 p. m. on February 24. When Captain Pullman learned of the small craft advisory at 4:30 or 5:00 p. m., the M/V LYNNE E. QUINN was approximately 7 miles south of Gulfport, Mississippi, and the tow continued in an easterly direction in increasingly heavy seas until 10:00 p. m., when the tug dropped anchor to ride out the weather. The brunt of the seas was borne by the barges in the port string, particularly the lead barge, the IBL–33.

10. The tug's crew did nothing to keep watch on the tow or to protect it while at anchor. At approximately 6:30 or 7:00 a. m. on February 25, the crew noticed that the bow of the IBL–33 was under water, and the barge was in danger of sinking. Although the M/V LYNNE E. QUINN had pumps on board, because the tug carried no hoses for them, they could not be used to save the IBL–33. The barge sank in 14 feet of water in the Mississippi Sound.

11. The stern barge in the port string, the CNC–265, also partially sank, but the tug was successful in beaching that barge before total submersion.

12. As a result of the sinking of the IBL–33, Aiple incurred salvage and repair expenses in the amount of $66,878.81. The vessel's cargo of corn, valued at $133,251.05, was salvaged, with a recovery of $17,031.41, leaving plaintiff with a net cargo loss of $116,219.64. Plaintiff's total damages amount to $183,098.45. During the salvage process, Cliff, Jr., Inc., provided tug services for the agreed price of $11,374.50.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this admiralty and maritime claim pursuant to 28 U.S.C. § 1333.

2. The principles of law relating to towage are well established. A tug owes a duty to exercise reasonable care and maritime skill, as prudent navigators employ in the performance of similar services. *Stevens v. The White City*, 285 U.S. 195 (1932).

3. Reasonable care and maritime skill necessitate that attention be given to the special circumstances involved in undertaking a specific task. The degree of care required of a tug is measured with reference to the character of the tow and the condition of the seas and weather. *National Transport Corp. v. Tug ABQUAIQ*, 418 F.2d 1241 (2d Cir. 1968); *M. P. Howlett, Inc. v. The Tug DALZELLIDO*, 324 F.Supp. 912 (S.D.N.Y.1971).

4. Prudent seamanship calls for the crew of a tug to conduct an inspection of the manhole covers on a barge to ensure that they are secured before proceeding into open waters, especially when heavy weather is expected. By taking an inland barge into open waters without at least checking to see that the manhole covers were twist-tightened when rough seas were predicted, the crew of the IBL–33 failed to exercise reasonable, prudent seamanship. *Ocean Burning v. Moran Towing & Trans. Co.*, 1974 A.M.C. 2307 (S.D.N.Y.1974); *McDonough Marine Service, Inc. v. M/V ROYAL ST.*, 465 F.Supp. 928, 934 (E.D.La. 1980). The negligence of the crew of the M/V LYNNE E. QUINN in not inspecting and securing the manhole covers was a proximate cause of the sinking of the IBL–33.

5. A tug has a duty to inspect the barges in her tow and keep those barges under close observation while under tow. *Dwyer Lighterage, Inc. v. Christie Scale Corp.*, 1951 A.M.C. .46 (E.D.N.Y.1951); *A. E. Staley Mfg. Co. v. Porto Rico Lighterage*, 323 F.Supp. 27 (E.D.La.1970), *aff'd*, 438 F.2d 1 (5th Cir. 1971). The M/V LYNNE E. QUINN was negligent in failing to keep proper watch over its tow.

6. A tug has an obligation to utilize available weather reports in order to operate in a manner consistent with foreseeable risks, and the Captain of a tug is chargeable with knowledge of weather predictions, whether he knows of them or not. *The Katie E*, 46 F.2d 534 (E.D.N.Y.1931); *The Eagle*, 52 F.Supp. 937 (E.D.N.Y.1944); *Ohio Valley Eng. v. Ove*, 214 F.Supp. 784 (E.D. La.1963). The failure of the M/V LYNNE E. QUINN to seek safe waters in light of

the available weather forecasts and weather encountered constitutes negligence.

7. The failure of the M/V LYNNE E. QUINN to have hoses for its pumps on board was an unseaworthy condition which contributed to the casualty. Had the pumps been operational, the barge might have been saved. The negligence of the tug's owners and captain in failing to have operational pumps proximately contributed to the sinking of the IBL–33.

■ 8. The sinking of the IBL–33 and the resulting damages were caused solely by the negligence of the M/V LYNNE E. QUINN and Cliff, Jr., Inc., in failing to properly monitor weather forecasts, in failing to properly prepare the barge for tow, in continuing the vessel's course with the weather and seas encountered, and in failing to take appropriate action to save the vessel. The IBL–33 was in all respects strong, tight, stanch and seaworthy. The lack of gaskets or washers on the manhole covers did not render the barge unseaworthy; had the manhole covers been screwed down properly by the crew, the lack of gaskets would have caused only insignificant seepage.

■ 9. Plaintiff claims entitlement to attorneys' fees by virtue of a breach of implied warranty of workmanlike performance owed to it by the tug, citing *Singer v. Dorr*, 272 F.Supp. 931 (E.D.La.1967). *Singer* involved a suit for wrongful death, negligence, and unseaworthiness against both a barge and a tug, in which the tug was found to be solely liable. The court, analogizing the case to a shipowner-stevedore situation, awarded the "innocent" barge the attorneys' fees incurred in its successful defense against the plaintiff. The court did not require the tug to pay for the fees incurred in the barge's claim for indemnity against the tug or for fees incurred in defending against the tug's cross-claim. Read most broadly, *Singer* suggests that had Aiple been forced to defend against a suit by Dreyfus, it might be entitled to recover attorneys' fees for that defense, but explicitly rules out the possibility of recovery of fees incurred in prosecuting the barge's

own claim for damage to the barge or in defending against the tug's counter-claim. The subrogation agreement between Dreyfus and Aiple entered into upon payment by Aiple of the cargo loss operates to make the *Singer* decision inapposite. No exceptions are present to the general rule that the prevailing party in an admiralty case is not entitled to an award for attorneys' fees. *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 730 (5th Cir. 1980). Aiple's claim for attorneys' fees is denied.

■ 10. The general rule in admiralty is to award interest from the date of casualty except where peculiar circumstances warrant awards only from the date of judgment. *Mobil Oil Corporation v. Tug Pensacola*, 472 F.2d 1175 (5th Cir. 1973). I find no such peculiar circumstances present in these facts.

Accordingly, judgment shall be entered for the plaintiffs in the sum of $183,098.45 plus interest from the date of casualty, February 25, 1979, and costs, and against the defendants. On the counterclaim of Cliff, Jr., Inc., judgment shall be entered in favor of Cliff, Jr., Inc. in the sum of $11,374.50 plus interest from the date of casualty, February 25, 1979, and costs, and against Aiple Towing Company, Inc.